Terry DiPETRILLO et al.

v.

The DOW CHEMICAL COMPANY.

No. 97–388–Appeal.

Supreme Court of Rhode Island.

April 26, 1999.

Lauren E. Jones, Philip M. Weinstein, Providence, Antonio Pyle, Pittsburgh, PA, for Plaintiff.

John Tarantino, Patricia Rocha, Providence, Graeme L. Bell, III, Hugh T. Young, Patrick W. Lee, for Defendant.

Present WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

LEDERBERG, Justice.

The defendant, Dow Chemical Company (Dow or defendant), has appealed from a judgment in favor of the plaintiffs, Terry DiPetrillo (Terry) and Donna DiPetrillo (Donna), following a jury award of $1 million to Terry as compensation for his injuries and $200,000 to Donna as compensation for her derivative loss of consortium. The jury found that Terry's injuries were proximately caused by an herbicide manufactured and sold by Dow. Following the denial of its motions for a new trial and judgment as a matter of law, the defendant appealed, citing numerous errors at trial. After careful review of the record, we reject the appeal and consequently affirm the judgment.

### Facts and Procedural History

Terry DiPetrillo began working for L.H. Meader Tree Company (Meader) in the spring of 1968. During the summers from 1968 through 1971, Terry sprayed pesticides and herbicides on the rights-of-way surrounding the high-tension power lines of Narragansett Electric Company (Narragansett). The plaintiffs alleged that one of these was a "2,4,5–T"[1]-based herbicide manufactured by Dow.[2] At trial, plaintiffs presented evidence that in the late 1960's and early 1970's, Dow sold 2,4,5–T–based products through authorized distributors to control the growth of foliage and that Narragansett provided Dow's 2,4,5–T to Meader, which used it to defoliate trees, plants, and stumps on the rights-of-way around Narragansett's high-tension power lines. During each year in which Terry claimed to have been exposed to Dow's

1. 2,4,5–T is an abbreviation for 2,4,5–trichlorophenoxyacetic acid, an organic compound that was widely used as an active ingredient in herbicides manufactured and sold in the United States before 1979.

2. The plaintiffs referred to the Dow-manufactured 2,4,5–T–based herbicide as "2,4,5–T." Dow, however, claimed that the 2,4,5–T–based herbicide manufactured by Dow at the relevant time was known as Esteron 245. In plaintiffs' answers to Dow's Request for Admissions, plaintiff admitted that he was exposed to a 2,4,5–T–based herbicide manufactured by Dow but could "neither admit nor deny that this herbicide was called Esteron 2,4,5 at the time he was exposed to it." Throughout this opinion, we will refer to the product plaintiff alleges caused his illness as "2,4,5–T."

2,4,5–T–based herbicide Esteron, the product was registered and labeled pursuant to the relevant federal pesticide statute, Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), 7 U.S.C. §§ 135 through 135k (West 1970).

Terry and a co-worker, Richard Meader, Jr., both testified that to the best of their recollections, the herbicide they used had been packaged in a blue and yellow container. Terry also testified that at some point, the color of the herbicide's container might have been changed to yellow and brown. Richard Meader did not recall using an herbicide packaged in a red and white or green and white container. Neither man remembered using an herbicide called Esteron. At trial, witnesses for Dow testified that they did not recall any packaging of Esteron 245 in blue and yellow or brown and yellow containers.

In December of 1990, Terry was diagnosed with multiple myeloma, a cancerous proliferation of plasma cells in the bone marrow causing destruction of the bone. He received chemotherapy for almost a year, followed by a bone marrow transplant in 1992. At the time of trial, Terry was in remission, but was still at a substantial risk for recurrence.

In December 1993, the DiPetrillos brought an action against Dow in the Superior Court. They made three claims in their amended complaint, alleging that: (1) Dow manufactured, marketed, and sold an herbicide known as 2,4,5–T that was defective and unreasonably dangerous by reason of its dangers to human health and its cancer-causing propensities, and Dow failed to warn users of such propensities; (2) Dow's manufacture, marketing, and

sale of its 2,4,5–T herbicide breached implied warranties of fitness and merchantability; and (3) Dow negligently placed "a defective and unreasonably dangerous product on the market * * *," failed to warn users of 2,4,5–T's dangerous propensities, and negligently failed to research and test the cancer-causing aspects of 2,4,5–T. In all counts, the DiPetrillos alleged causation and damages and claimed additionally that Donna suffered damages for loss of consortium.

On March 27, 1996, Dow's motion for summary judgment was denied. Prior to trial, Dow filed motions to exclude any evidence concerning two "Suspension" reports and to bar any reference to Agent Orange.[3] In addition, Dow moved to apply the 1972 version of FIFRA to the DiPetrillos' claims[4] and to conduct a preliminary hearing under the Rhode Island Rules of Evidence in order to examine the scientific bases of the evidence of causation on which plaintiffs' expert witnesses would testify. The plaintiffs filed an objection to the motion for such a hearing.

After trial, the jury returned a verdict for plaintiffs. The jury responded to specific questions and found the following facts by a fair preponderance of the credible evidence:

"▮ that the Defendant manufactured and sold 245–T * * * during the period 1968 through 1972, and that Plaintiff used 245–T manufactured by Defendant in his work at L.H. Meader Tree Company. * * *

▮ that 245–T, as manufactured and sold by Defendant, was unreasonably dangerous and therefore defective * * *

3. The trial justice considered this motion and cautioned counsel to limit references to Agent Orange. She noted that because 2,4,5–T was also an element of Agent Orange (a phenoxyherbicide manufactured by Dow containing primarily 2,4,5–T and 2,4–D), some references to Agent Orange would be permitted.

The plaintiffs' original complaint alleged that Terry's injuries were caused by exposure to Agent Orange. After Dow moved for sum-

mary judgment on the ground that Dow never sold or delivered Agent Orange to Meader during any relevant time, plaintiffs subsequently amended their complaint to allege that Terry's injuries were caused by exposure to a Dow manufactured herbicide "known as 2,4,5–T."

4. This pre-trial motion was denied.

[and that this] conduct proximately caused Plaintiffs injury. * * *

■ that 245–T, as manufactured and sold by Defendant, was defective because of Defendants failure to warn of the products alleged dangerous propensities * * * [and that this] conduct proximately caused Plaintiffs injury. * * *

■ that Defendant breached the implied warranty of merchantability regarding its 245–T * * * [and that this] conduct proximately caused Plaintiffs injury. * * *

■ that Defendant was negligent in its manufacture and sale of its 245–T * * * [and that this] conduct proximately caused Plaintiffs injury."

On the basis of these findings, the jury awarded $1,000,000 to Terry and $200,000 to Donna.

Following the jury verdict, defendant filed a motion for a judgment as a matter of law or, in the alternative, a motion for a new trial. Both motions were denied. On appeal, Dow alleged numerous errors that we now address. Additional relevant facts will be provided in the analysis of the issues raised by this appeal.

### Statute of Limitations

■ In its motion for judgment as a matter of law and in its brief to us on appeal, Dow argued that plaintiffs' claims were barred by the statute of limitations. This Court held in *Anthony v. Abbott Laboratories*, 490 A.2d 43 (R.I.1985), that the statute of limitations in drug product-liability cases begins to run when the "person discovers, or with reasonable diligence should have discovered, the wrongful conduct of the manufacturer." *Id.* at 46. The Court arrived at this determination after a careful balancing of policies emanating from our earlier opinion in *Wilkinson v. Harrington*, 104 R.I. 224, 243 A.2d 745 (1968), a medical malpractice case, in which we held that "a person should have reasonable opportunity to become cognizant of an injury and its cause before the statute of limitations begins to run," *An-*

*thony*, 490 A.2d at 45. *Anthony* applied the same rule to drug product-liability cases in which adverse effects of any exposure may not be manifested until a significant period of time has passed. *Id.* at 46. It is our conclusion that the discovery rule as articulated in *Anthony* applies to the type of injury that occurred in this case, wherein plaintiffs did not suspect any dangerous consequences from Terry's exposure to allegedly toxic chemicals between 1968 and 1972. Therefore, we reject defendant's contention that any causes of action accrued *before* Terry became ill and could have discovered Dow's allegedly wrongful conduct. Rather, we hold that the trial justice properly applied the discovery rule. Consequently, plaintiffs' claims were not barred by the statute of limitations, and Dow's motion for judgment as a matter of law was properly denied.

### Applicable Law

At trial and on appeal, the parties disputed which version of FIFRA should be applied to the events in this case. The plaintiffs alleged that the 1964 enactment of the statute should be applied, while defendant argued that the 1972 enactment was applicable.

In their complaints, plaintiffs alleged that, *between 1968 and early 1972,* defendant provided, manufactured, and sold a product that caused plaintiffs' injuries. Thus, the conduct under challenge occurred between 1968 and 1972, during which years the 1964 enactment of FIFRA was in effect. In *Landgraf v. USI Film Products,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), the United States Supreme Court enunciated the general principle that " 'the legal effect of conduct should ordinarily be assessed under the *law that existed when the conduct took place * * *.' " Id.* at 265, 114 S.Ct. at 1497, 128 L.Ed.2d at 252 (Emphasis added.). The Court directed that this principle mandates that subsequently enacted legislation should not be applied retroactively

unless there exists clear evidence of congressional intent to achieve that result. *Id.* at 280, 114 S.Ct. at 1505, 128 L.Ed.2d at 262.

■ The evidence pertaining to FIFRA indicates that Congress did not intend to apply the 1972 version of FIFRA retroactively to conduct that occurred before the 1972 enactment. Specifically, the historical note to 7 U.S.C.A. § 136 (West 1980) explains the effective dates and savings provisions of the 1972 FIFRA. Relevant to the question here is subsection (e) of the historical note: "For purposes of determining any criminal or civil penalty or liability to any third person in respect of *any act or omission occurring before the [effective date of the 1972 Act, October 21, 1972]*, the Federal Insecticide, Fungicide, and Rodenticide Act *shall be treated as continuing in effect as if [the 1972 Act] had not been enacted.*" Historical Note to 7 U.S.C.A. § 136 (West 1980) (Emphases added.). Thus, we conclude that the 1964 version of FIFRA is applicable to conduct that occurred before the effective date of the 1972 amendments on October 21, 1972.

This result accords with decisions in the related area of tobacco litigation, in which courts almost uniformly have held that the federal statute in effect at the time of the exposure should be applied. *See, e.g., Kotler v. American Tobacco Co.,* 685 F.Supp. 15 (D.Mass.1988), *aff'd,* 981 F.2d 7 (1st Cir.1992) (holding that the relevant federal statute should not be applied retroactively); *Cipollone v. Liggett Group, Inc.,* 649 F.Supp. 664, 668 (D.N.J.1986) (same), *rev'd in part on other grounds,* 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992).

Therefore, we affirm the trial justice's determination that defendant's conduct should be judged according to the provisions of the 1964 statute. In so holding, we are unpersuaded by, and therefore reject, the holding of *Kennan v. Dow Chemical Co.,* 717 F.Supp. 799, 810–11 (M.D.Fla. 1989) (applying the 1972 FIFRA to claims based on pre–1972 exposure). We instead align ourselves with the conclusion of the court in *Gibson v. Dow Chemical Co.,* 842 F.Supp. 938, 940 (E.D.Ky.1992) (holding that the pre–1972 version of FIFRA should be applied to claims arising from pre–1972 exposure).

### Preemption Doctrine

Under Article VI, clause 2, of the Supremacy Clause of the United States Constitution, federal law preempts state laws that "interfere with, or are contrary to" federal law. *Hillsborough County, Florida v. Automated Medical Laboratories, Inc.,* 471 U.S. 707, 712, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714, 721 (1985). The defendant argued that, even assuming the applicability of the 1964 version of FIFRA, all plaintiffs' claims were *impliedly* preempted despite the fact that the 1964 enactment, unlike the 1972 version,[5] did not *explicitly* preempt state law. In a case holding that FIFRA did not preempt local governmental regulation of pesticide use, the United States Supreme Court outlined preemption doctrine. In *Wisconsin Public Intervenor v. Mortier,* 501 U.S. 597, 111 S.Ct. 2476, 115 L.Ed.2d 532 (1991), the Court explained that federal preemption can be implied in several, limited circumstances. Absent express language,

> "Congress' intent to supersede state law in a given area may nonetheless be implicit if a scheme of federal regulation is 'so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it,' if 'the Act of Congress * * * touch[es] a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject,' or if the goals 'sought to be obtained' and the 'obligations im-

---

5. The 1972 enactment explicitly preempts state authority to regulate pesticide labeling. 7 U.S.C.A. § 136v(b) (West 1980) provides: "Such State shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter."

posed' reveal a purpose to preclude state authority." *Id.* at 605, 111 S.Ct. at 2481–82, 115 L.Ed.2d at 542–43 (Alterations in original.).

In so directing, the Court was careful to assert that " 'we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' " *Id.* at 605, 111 S.Ct. at 2482, 115 L.Ed.2d at 543. *See also Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485, 116 S.Ct. 2240, 2250, 135 L.Ed.2d 700, 715 (1996) (quoting the same language).

In our opinion, the 1964 FIFRA does not create federal regulation "so pervasive" as to manifest a congressional intent to preempt the field by precluding all state authority. Rather, the Supreme Court in *Wisconsin Public Intervenor* explained that the 1964 version was amended *because* Congress believed that the 1964 version was not sufficiently comprehensive.

"FIFRA was enacted in 1947 to replace the Federal Government's first effort at pesticide regulation[.] * * * FIFRA as originally adopted 'was primarily a licensing and labeling statute.' * * * In 1972, growing environmental and safety concerns led Congress to undertake a comprehensive revision of [the 1964] FIFRA * * *. The 1972 amendments significantly strengthened FIFRAs registration and labeling standards. * * * An additional change was the grant of increased enforcement authority to the Environmental Protection Agency * * *. * * * In this fashion, the 1972 amendments 'transformed FIFRA from a labeling law into a comprehensive regulatory statute.' " *Wisconsin Public Intervenor*, 501 U.S. at 601, 111 S.Ct. at 2479–80, 115 L.Ed.2d at 540.

The only rational inference this interpretation by the Court permits is that, prior to the 1972 amendments, FIFRA did not embody a comprehensive regulatory scheme through which Congress intended to preempt the field.

Furthermore, the addition of express preemption language in the 1972 enactment clearly manifested, at that point, Congress' intent to preempt state law and demonstrated its awareness that the 1964 version did not achieve that result. Moreover, were we to adopt defendant's construction that the 1964 FIFRA impliedly preempted the field, such an interpretation would "have the perverse effect of granting complete immunity from design defect liability to an entire industry that, in the judgment of Congress, needed more stringent regulation * * *." *Medtronic, Inc.*, 518 U.S. at 487, 116 S.Ct. at 2251, 135 L.Ed.2d at 716–17.

We therefore affirm the trial justice's determination that plaintiffs' claims were not preempted under the 1964 enactment of FIFRA.

### Adequate Notice for a Breach of Warranty Claim

The defendant also asserted that, assuming the viability of plaintiffs' state law causes of action, none of plaintiffs' warranty theories should have been submitted to the jury because notice is an essential requirement of a breach of warranty claim, and plaintiffs failed to prove that they provided notice of any breaches to defendant.

General Laws 1956 § 6A–2–607(3)(a) provides that, when bringing a claim for a breach of an implied warranty, the *"buyer* must within a reasonable time after he or she discovers or should have discovered any breach notify the seller of breach or be barred from any remedy * * *." (Emphasis added.) The purpose of the notice requirement in the first instance "provides the seller a chance to correct any defect. * * * Second, notice affords the seller an opportunity to prepare for negotiation and litigation. Third, notice provides the seller a safeguard against stale claims being asserted after it is too late for the manufacturer or seller to investigate them."

*Prutch v. Ford Motor Co.*, 618 P.2d 657, 661 (Colo.1980).

■ Here, the allegedly defective product was used between 1968 and 1972, but Terry, a non-purchaser, did not discover and could not reasonably have discovered any putative defect until he was diagnosed with cancer in 1990. By that time, there was nothing that defendant could have done to reverse the effects of Terry's exposure to the allegedly defective product between 1968 and 1972. Hence, on the facts of this case, we hold that the filing of the complaint constituted sufficient notice of the breach of the implied warranty. *See also Cole v. Keller Industries, Inc.*, 132 F.3d 1044, 1047 (4th Cir.1998) (noting and agreeing with the holding of "every reported case which has come to our attention, save one, * * * that a non-purchaser in a suit on warranty need not comply with the notice requirement of the Uniform Commercial Code in order to recover for personal injuries rather than for economic loss"); *McKnelly v. Sperry Corp.*, 642 F.2d 1101, 1107 (8th Cir.1981) (holding that the "notice provision is inapplicable to third parties, at least where personal injuries rather than economic losses are sustained"); *Shooshanian v. Wagner*, 672 P.2d 455 (Alaska 1983) (holding that the filing of the complaint by a consumer satisfies the statutory notice requirement).

### Preliminary Evidentiary Hearing

Prior to trial, Dow filed a motion "to conduct preliminary inquiry under R.I.[R.] Evid. 104(a) and (c) of Plaintiffs' experts on the purported 'causation' evidence that Plaintiff, Terry DiPetrillo's multiple myeloma was * * * causally related to his alleged exposure to an herbicide manufactured by Dow and * * * Dow, for grounds of its motion, states that it seeks to challenge the bases of the alleged causation expert testimony and whether the basis and facts supporting such causation opinions are scientifically or medically supported to the extent that they should be deemed admissible under Rules 401, 403, 702, 703, and 704. *See also Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)."[6]

■ We are of the opinion that this motion was not sufficient to trigger the trial justice's attention to the issue at stake here. A proper motion would have alerted the trial justice by presenting a sufficient affidavit or offer of proof to substantiate Dow's claim that plaintiffs' proposed expert testimony was scientifically invalid.

On the same day that Dow filed this motion for a preliminary hearing, it filed four additional evidentiary motions. A comparison of these motions to Dow's motion for a preliminary hearing further reveals the inadequacy of its motion requesting a preliminary hearing. The four evidentiary motions were each supported by extensive legal arguments and/or affidavits and other factual materials.[7] In

---

6. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (*Daubert I*), and its progeny have generated hundreds of writings in the form of books, law review articles, and other commentary. For comprehensive sources on the meaning and application of *Daubert I, see, e.g.,* 1 David L. Faigman et al., *Modern Scientific Evidence: The Law and Science of Expert Testimony* (West 1997); *Reference Manual on Scientific Evidence,* Federal Judicial Center (1994); G. Michael Fenner, *The* Daubert *Handbook: The Case, Its Essential Dilemma, and Its Progeny,* 29 Creighton L.Rev. 939 (1996); *Standards and Procedures for Determining the Admissibility of Expert*

Evidence After Daubert, 157 F.R.D. 571 (West 1994).

7. Dow filed a nine-page motion and memorandum of law (supported by affidavits and excerpts from depositions) to exclude evidence of Agent Orange, a twelve-page motion and memorandum of law to exclude evidence of a 1970 U.S.D.A. suspension of 2,4,5–T products for certain uses, an eleven-page motion and memorandum of law to exclude evidence of a 1979 E.P.A. emergency suspension of 2,4,5–T for rights-of-way spraying and other uses, and a five-page motion to strike part of a video deposition, supported by excerpts from the transcript of the deposition.

contrast, Dow's motion for a preliminary hearing pursuant to Rule 104 of the Rhode Island Rules of Evidence was relatively brief, was not supported by an accompanying memorandum, and did not argue or attempt to show that the plaintiffs' proffered scientific evidence had not been validated. The motion stated only that Dow requested an opportunity "to challenge the bases of the alleged causation expert testimony," but it did not reveal on what grounds Dow considered plaintiffs' experts' opinions to be challengeable, much less that it deemed such evidence to be scientifically invalid. An "appropriate objection or motion" is one that "alert[s] the trial justice to the *need* for holding a preliminary evidentiary hearing." *State v. Quattrocchi,* 681 A.2d 879, 884 n. 3 (R.I.1996) (emphasis added).[8] Dow's motion failed to provide the trial justice with sufficient notice and specificity that the alleged defect in plaintiffs' proffered causation expertise was that it utilized invalidated, novel, and complex scientific theories and was therefore unreliable. Consequently, the motion was not an "appropriate objection or motion to suppress" as required by *Quattrocchi.* *Id.* at 884.

Moreover, the record fails to show that Dow obtained a ruling from the trial justice on its pretrial motion for a preliminary evidentiary hearing. While Dow secured hearings and rulings on the other four pretrial evidentiary motions filed on April 17, 1996, and although counsel for the parties indicated at oral argument that they understood the trial justice to have denied the motion, the record fails to indicate that Dow pursued a ruling on its motion for a

pretrial 104 hearing.[9] Without a record, Dow's claim that the trial justice erroneously denied the motion is impossible to review on appeal. *See In re Kimberly and James,* 583 A.2d 877, 879 (R.I.1990) ( " '[A] party seeking to have this court review alleged error, has the burden of furnishing [the court] with so much of the record as may be required to enable th[e] court to pass on the error alleged.' ")

Furthermore, Dow failed to object at any time to the court's proceeding to trial before first passing on its motion and before first holding the requested preliminary evidentiary hearing of plaintiffs' proposed expert witnesses. And importantly, at trial, Dow failed to renew its motion to request a Rule 104 hearing without the presence of the jury at any point during the trial, failed to move to voir dire the experts when they testified, failed to move to strike their testimony as scientifically invalid after they testified, and failed at any time during trial to object or to seek a continuous objection to the admissibility of the proffered expert testimony on the basis that the evidence was scientifically invalid or that it should not be admitted without first holding a non-jury hearing to determine its reliability.[10] These failures contrast with Dow's motion, pursuant to Rule 46 of the Superior Court Rules of Civil Procedure, for a continuing objection to the admission of all "failure to warn" evidence.

Had defendant preserved its objections in the above-specified manner—for example by filing a pretrial motion with sufficient notice and specificity in addressing the admissibility of the allegedly novel, complex scientific evidence offered in this

---

**8.** In *State v. Quattrocchi,* 681 A.2d 879 (R.I. 1996), the defendant submitted memoranda of law to support his *in limine* motions to exclude certain testimony. These memoranda explicitly challenged the validity and reliability of the particular techniques and compared different scientific theories. *Id.* at 881.

**9.** In its brief, Dow acknowledged: "There is no transcript of the trial courts ruling on this issue[.]"

**10.** In some instances, Dow did object to causation testimony given by plaintiffs' experts and did move to strike portions of this testimony. But Dow never objected to plaintiffs' experts on the ground that the scientific testimony was scientifically invalid.

case, and then renewed such a motion during the trial—we are of the opinion that under R.I.R. Evid. 104, the trial justice, in the context of this evidentiary record, may have abused her discretion by not holding either a preliminary hearing or a non-jury evidentiary hearing during the trial to determine the admissibility of the proffered evidence.

Shortly after judgment on the verdict was entered in the case at bar, this Court issued the *Quattrocchi* opinion in which we held that if an *appropriate* motion or objection challenges the admission of novel, unvalidated scientific or complex technical evidence in a criminal or civil trial, the trial justice exercises a gatekeeping function by "hold[ing] a preliminary evidentiary hearing outside the presence of the jury in order to determine whether such evidence is reliable and whether the situation is one on which expert testimony is appropriate." *Quattrocchi*, 681 A.2d at 884.

Recently, in *Kumho Tire Co., Ltd. v. Carmichael*, — U.S. —, —, 119 S.Ct. 1167, 1171, 143 L.Ed.2d 238, — (1999), the United States Supreme Court concluded that "*Daubert* s general holding—setting forth the trial judge's general 'gatekeeping' obligation—applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." The Court reasoned:

> "it would prove difficult, if not impossible, for judges to administer evidentiary rules under which a gatekeeping obligation depended upon a distinction between 'scientific' knowledge and 'technical' or 'other specialized' knowledge. There is no clear line that divides the one from the others. Disciplines such as engineering rest upon scientific knowledge. Pure scientific theory itself may depend for its development upon observation and properly engineered machinery. And conceptual efforts to distinguish the two are unlikely to produce

clear legal lines capable of application in particular cases." *Id.* at —, 119 S.Ct. at 1174, 143 L.Ed.2d at —.

In addressing the circumstances in which a preliminary hearing would be held, *Quattrocchi* cited "the landmark case" of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (*Daubert I* ), which established a federal standard for admitting expert scientific testimony. Prior to *Daubert I*, federal courts and many state courts applied the "general acceptance" test of *Frye v. United States*, 293 F. 1013, 1014 (D.C.Cir.1923), under which expert opinion on a scientific method was admissible if the technique had been "generally accepted" by the relevant scientific community. *Daubert I*, 509 U.S. at 584–85, 113 S.Ct. at 2792, 125 L.Ed.2d at 477–78. Consequently, "[t]he judge's task under *Frye* is relatively simple: to determine whether the method employed by the experts is generally accepted in the scientific community." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1315 (9th Cir.), *cert. denied*, 516 U.S. 869, 116 S.Ct. 189, 133 L.Ed.2d 126 (1995) (*Daubert II* ).

In *Daubert I*, the Supreme Court held that *Frye* s inflexible standard was neither incorporated into nor was it compatible with Rule 702 or with the Federal Rules of Evidence. *Daubert I*, 509 U.S. at 588, 113 S.Ct. at 2794, 125 L.Ed.2d at 480. The Court went on to explain that the fact that seventy years had elapsed before "the *Frye* test was displaced by the Rules of Evidence does not mean * * * that the Rules themselves place no limits on the admissibility of purportedly scientific evidence." *Id.* at 589, 113 S.Ct. at 2794–95, 125 L.Ed.2d at 480. Rather, "under the Rules the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Id.* at 589, 113 S.Ct. at 2795, 125 L.Ed.2d at 480. Rule 702 [11] was cited as the pri-

---

11. Rule 702 of the Rhode Island Rules of Evidence is essentially identical to the Federal Rule and provides:

mary locus of the trial judge's obligation, given that the Rule "clearly contemplates some degree of regulation of the subjects and theories about which an expert may testify." *Id.* In short, the trial judge must ensure that "an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.* at 597, 113 S.Ct. at 2799, 125 L.Ed.2d at 485.

Prior decisions of this Court have adverted to the *Frye* "general acceptance" standard, *see, e.g., Quattrocchi,* 681 A.2d at 884; *In re Odell,* 672 A.2d 457, 459 (R.I. 1996); *State v. Dery,* 545 A.2d 1014, 1016 (R.I.1988); *State v. Wheeler,* 496 A.2d 1382, 1387–89 (R.I.1985), even though this Court has not strictly adhered to that standard. Instead, we employed a more flexible relevance/helpfulness analysis. *See, e.g., State v. Morel,* 676 A.2d 1347, 1355 (R.I.1996) (holding that the trial justice properly admitted scientific evidence that he determined was relevant and would assist the trier of fact); *In re Odell,* 672 A.2d at 459 (noting the importance of relevance in admitting scientific evidence); Advisory Committee's Note to R.I.R. Evid. 702 ("In analyzing the admissibility [of scientific evidence], the Court [in *Wheeler* ] declined to apply the outdated and restrictive standard enunciated in *Frye* * * *. Instead, the Court applied a more open relevance/helpfulness approach that combine[d] the principles of Rules 401 (relevancy) and 702 (helpfulness) in a Rule 403–type of balancing.")

Though we declined expressly to adopt the *Daubert I* standard, our previous cases have endorsed its principles. For exam-

"Testimony by experts. If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of fact or opinion."
By specifying "fact or opinion" in lieu of the federal rule's "opinion or otherwise," R.I.R. Evid. 702 does not depart substantively from F.R. Evid. 702. *See also* Advisory Committee's Note to R.I.R. Evid. 702.

ple, *Morel* relied on our earlier opinion in *Wheeler* in holding that scientific expert testimony would be admissible if such evidence was relevant, appropriate, and of assistance to the jury. *Morel,* 676 A.2d at 1355. We further noted that *Wheeler* "is consistent with *Daubert [I* ], * * * the reasoning and guidelines of which we find helpful and illuminating." *Id.* at 1355 n. 2. Similarly, in *In re Odell,* we noted that "[o]ur holding in *Dery* is therefore consistent with the opinion of the Supreme Court in *Daubert [I],* " 672 A.2d at 459, and we also cited *Daubert I* with approval in *Gallucci v. Humbyrd,* 709 A.2d 1059, 1064 (R.I.1998).

Because more and more litigation will include complex and/or novel scientific and technical evidence, we shall take this opportunity to offer guidance on the standard for admissibility that should govern preliminary hearings and hearings out of the presence of the jury. Such hearings would address any genuine issue of the validity of the scientific theory to be applied in cases, for example, of mass toxic torts, products liability, medical malpractice, environmental, criminal cases, or in the emerging fields of genetic engineering and organ harvesting, in which evidence of toxicology, epidemiology, immunology, risk analysis, or genetics to name a few may be presented.

In such cases, within discretion, the trial justice must control the gateway for expert scientific testimony by conducting pursuant to Rule 104 an early, preliminary assessment of the evidence: [12]

**12.** Rule 104 of the Rhode Island Rules of Evidence provides:
"Preliminary questions.—(a) *Questions of Admissibility Generally.* Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court subject to the provisions of subdivision (b). In making its determination it is not bound by the rules of evidence except those with respect to privileges.
* * *

"Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a) whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine the fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether the reasoning or methodology properly can be applied to the facts in issue." *Daubert I*, 509 U.S. at 592–93, 113 S.Ct. at 2796, 125 L.Ed.2d at 482.[13]

The weight of authority and the reported cases generally conclude that a preliminary assessment of the expert's testimony should occur before trial, but in any case, *in limine*. Justice Breyer, in discussing the role of judges in dealing with scientific evidence, has explained that there is imposed

"on trial judges the duty, in respect to scientific evidence, to become evidentiary 'gatekeepers.' The judge, without interfering with the jury's role as trier of fact, must determine whether purported scientific evidence is 'reliable' and will 'assist the trier of fact' * * *. Trial judges, looking for ways better to perform this function, increasingly have used pretrial conferences to narrow the scientific issues in dispute, [and] pretrial hearings where potential experts are subject to examination by the court * * *." Stephen Breyer, *The Interdependence of Science and Law*, 82 Judicature 24, 26 (1998).

(c) *Hearing of Jury.* Hearings on the admissibility of confessions shall in all cases be conducted out of the hearing of the jury. Hearings on other preliminary matters shall also be conducted out of the presence of the jury when the interests of justice require or, when an accused is a witness, if the witness so requests."

With the exception of several clarifying phrases, R.I.R. Evid. 104 is identical to F.R. Evid. 104. Advisory Committee's Note.

In applying *Daubert*, the Eighth Circuit has held in *Hose v. Chicago Northwestern Transportation Co.*, 70 F.3d 968, 973 n. 3 (8th Cir.1995), that "[c]hallenges to the scientific reliability of expert testimony should ordinarily be addressed prior to trial." The court went on to explain that "[a]n early evidentiary challenge allows the trial judge to exercise properly the 'gatekeeping role' regarding expert testimony envisioned under *Daubert*." *Id.* And in *Robinson v. Missouri Pacific Railroad Co.*, 16 F.3d 1083, 1089 (10th Cir.1994), the Tenth Circuit suggested that "as 'gatekeeper' the district court carefully and meticulously make an early pretrial evaluation of issues of admissibility * * *." *See also Daubert II*, 43 F.3d at 1319 n. 10 ("Where the opposing party * * * raises a material dispute as to the admissibility of expert scientific evidence, the [trial] court must hold an in limine hearing (a so-called *Daubert* hearing) to consider the conflicting evidence and make findings about the soundness and reliability of the methodology employed by the scientific experts. *See* Fed.R.Evid. 104(a).").

In commenting on the advantages of early pretrial hearings on novel or complex expert testimony, Professor Fenner has concluded, "[w]hether it is a jury trial or a trial to the judge, early pretrial Rule 104(a) hearings with serious consideration of the motion *in limine* benefits everyone: the judge, the jury, the lawyers, the parties, everyone." G. Michael Fenner, *The Daubert Handbook: The Case, Its Essential Dilemma, and Its Progeny*, 29 Creighton L.Rev. 939, 957 (1996). Early Rule 104 hearings serve to educate the judge in the special vocabulary of the relevant sci-

**13.** If and when the situation arises, this Court will address the appropriate standard of review of a trial courts decision to admit or exclude scientific evidence after a preliminary *Daubert* hearing, in light of the Supreme Court's opinion in *General Electric Co. v. Joiner*, 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) (holding that the abuse of discretion standard is the proper one by which to review a trial court's decision whether to admit scientific evidence).

ence before the evidence is introduced at trial, and such hearings can be more cost effective for the parties if issues are resolved prior to trial. *Id.*

Additionally, a preliminary determination of admissibility allows, pursuant to R.I.R. Evid. 403, the exclusion of relevant evidence if "it's probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury * * *." In acknowledging the advantage of this approach, the *Daubert I* Court cited Judge Weinstein who explained: " 'Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 * * * exercises more control over experts than over lay witnesses.' " *Daubert I*, 509 U.S. at 595, 113 S.Ct. at 2798, 125 L.Ed.2d at 484. Moreover, a trial judge may employ the "conventional devices" of granting a motion for judgment as a matter of law under Super. R. Civ. P. 50(a) or of granting a summary judgment under Super. R. Civ. P. 56 in the event causation evidence essential to a plaintiff's claim is deemed inadmissible. In short,

> "[t]he references to [Rules of Evidence 104, 403, 703, and 706] in the *Daubert* [*I* ] opinion suggest the importance of a pretrial procedure by which the trial judge gathers the necessary information and evaluates both the reliability of the underlying principles and methodology employed by the proposed expert witness and the potential relevance of the proposed evidence * * *. The trial court is then in a position to balance the reliability of the opinion's underlying principles and methodology and the potential relevance of the opinion against the dangers of unfair prejudice, confusion, misleading evidence, undue delay, waste of time and the presentation of cumulative evidence." *Standards and Procedures for Determining the Admis-*

*sibility of Expert Evidence After* Daubert, 157 F.R.D. 571, 580 (West 1995).

The requirement of a preliminary hearing is not appropriate, however, if

> "an expert's expertise is so common and well understood that the necessary foundation can be laid while qualifying the witness as an expert during the trial, on the stand, in front of the jury. There may be no need for a separate hearing. If the expert's evidence is not novel, then the foundation need not be novel either." 29 Creighton L.Rev. at 948.

The impact of *Daubert* in such a case "may be inert—the [trial] court may be able to take judicial notice of the reliability of the expert's theory and methodology, the foundation may be able to be laid in front of the jury, or no one will raise the issue." *Id.* at 949 n. 60.

Under *Daubert I*, then, trial judges may continue to utilize R.I.R. Evid. 201 with respect to scientific theories and methods that are well established. Generally, if judicial notice is appropriate or if the same evidence that is relevant to the *Daubert* issue "is also relevant to weight or credibility, and time is saved by taking foundation proof in the presence of the jury * * * [and it] may be heard by the jury with no adverse effect," Advisory Committee's Note to R.I.R. Evid. 104, a *Daubert* hearing is not required in the admission of the evidence. *See United States v. Johnson*, 56 F.3d 947, 952 (8th Cir.1995) (noting that because the court had previously determined that DNA profiling was reliable under *Daubert I*, in the future courts could take judicial notice of that finding of reliability); *In re Paoli Railroad Yard PCB Litigation*, 35 F.3d 717, 744 n. 10 (3rd Cir.1994) ("if it is a technique of uncontroverted validity, this [*Daubert* ] inquiry can be resolved by judicial notice. In *Daubert*, the Supreme Court * * * not[ed] that some techniques are so well established that judicial notice of their reliability is appropriate."), *cert. denied*, 513 U.S. 1190, 115 S.Ct. 1253, 131 L.Ed.2d 134 (1995), *affd*, 113 F.3d 444 (3rd Cir.1997); *United*

*States v. Martinez,* 3 F.3d 1191, 1197 (8th Cir.1993) (same).

In essence, instead of limiting expert scientific testimony to that which passed muster under *Frye* s exclusive test of general acceptance, *Daubert I* offered a non-exclusive composite of factors to be considered by trial judges in performing their task of ensuring that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert I,* 509 U.S. at 589, 113 S.Ct. at 2795, 125 L.Ed.2d at 480. In performing that task, trial judges must "determine whether those experts' proposed testimony amounts to 'scientific knowledge,' constitutes 'good science,' and was 'derived by the scientific method.'" *Daubert II,* 43 F.3d at 1316. The Supreme Court, without "presum[ing] to set out a definitive checklist or test" for undertaking this review, *Daubert I,* 509 U.S. at 593, 113 S.Ct. at 2796, 125 L.Ed.2d at 482, specifically set forth four factors for consideration: (1) whether the proffered knowledge can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) whether the theory or technique has gained general acceptance in the relevant scientific field. *Id.* at 593–94, 113 S.Ct. at 2796–97, 125 L.Ed.2d at 482–83. *See also Quattrocchi,* 681 A.2d at 884 (citing *Daubert I* factors). These factors frame the critical *Daubert I* analysis:

> "First, * * * whether the experts' testimony reflects 'scientific knowledge,' whether their findings are 'derived by the scientific method,' and whether their work product amounts to 'good science.' * * * Second, * * * [whether] the proposed expert testimony is 'relevant to the task at hand,' * * * i.e., that it logically advances a material aspect of the proposing party's case." *Daubert II,* 43 F.3d at 1315.

These factors need not and most likely will not be given equal weight in the analysis. An expert's findings may, for example, be based on sound science that has been tested and has yielded an acceptable rate of error, but has not gained general acceptance in the relevant field. Under the *Frye* test, evidence that at one time supported novel theories would be inadmissible, such as evidence presented by Galileo that the earth revolves around the sun or by Columbus that the earth is round. But such evidence may be admissible under *Daubert I'* s more liberal, multi-faceted analysis.

The second prong of the *Daubert I* analysis requires the trial court to evaluate the relevance of proffered testimony in assisting the trier of fact to understand the evidence or to determine a fact in evidence. The expert scientific testimony must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Daubert I,* 509 U.S. at 591, 113 S.Ct. at 2796, 125 L.Ed.2d at 481. In other words, "the 'fit' between the testimony and an issue in the case" is critical. *Daubert II,* 43 F.3d at 1320. In any case, the proffering party must prove the reliability and relevance of the expert scientific testimony by a preponderance of the evidence. *Daubert I,* 509 U.S. at 592 n. 10, 113 S.Ct. at 2796 n. 10, 125 L.Ed.2d at 482 n. 10.

Additional considerations that other courts have determined may bear on the evaluation of expert testimony are: whether the experts are testifying about research they "conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying," *Daubert II,* 43 F.3d at 1317, the relationship of the technique to methods that have been established as reliable, *In re Paoli Railroad Yard PCB Litigation,* 35 F.3d at 742 n. 8, the qualifications of the expert, *id.,* and the non-judicial application of the method, *id.*

Trial judges are not required to become scientific experts in order to apply the *Daubert I* standard. Rather, once an expert has shown that the methodology or principle underlying his or her testimony

is scientifically valid and that it "fits" an issue in the case, the expert's testimony should be put to the trier of fact to determine how much weight to accord the evidence. *Ambrosini v. Labarraque*, 101 F.3d 129, 134 (D.C.Cir.1996), *cert. dismissed*, 520 U.S. 1205, 117 S.Ct. 1572, 137 L.Ed.2d 716 (1997). *See also Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1230 (9th Cir.1998) ("Judges in jury trials should not exclude expert testimony simply because they disagree with the conclusions of the expert. The *Daubert* duty is to judge the reasoning used in forming an expert conclusion. The test is whether or not the reasoning is scientific and will assist the jury. If it satisfies these two requirements, then it is a matter for the finder of fact to decide what weight to accord the experts testimony."); *Gallucci*, 709 A.2d at 1064–65 (holding that conflation of the trial justice's role with that of the jury by excluding expert scientific testimony that fulfilled the two *Daubert* requirements of reliability and relevance was reversible error).

> "In short, *Daubert* neither requires nor empowers trial courts to determine which of several competing scientific theories has the best provenance. It demands only that the proponent of the evidence show that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable

fashion. *See Kannankeril v. Terminix Int'l., Inc.*, 128 F.3d 802, 806 (3d Cir. 1997); *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir.1994)." *Ruiz–Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 85 (1st Cir.1998).

In order to assist trial judges in analyzing expert evidence, we note that R.I.R. Evid. 706[14] allows appointment of neutral experts to aid in evaluating scientific evidence. *See Daubert I*, 509 U.S. at 595, 113 S.Ct. at 2798, 125 L.Ed.2d at 484 (noting that, in assessing the proffered evidence, "Rule 706 allows the court at its discretion to procure the assistance of an expert of its own choosing").[15]

### Admission of Evidence

■ The defendant also contended that the trial justice erred in admitting several additional sources of evidence. "It is well established that 'the admissibility of evidence is within the sound discretion of the trial justice, and this Court will not interfere with the trial justice's decision unless a clear abuse of that discretion is apparent.' *Soares v. Nationwide Mutual Fire Insurance Company*, 692 A.2d 701, 701–02 (R.I.1997) (mem.)." *Bourdon's, Inc. v. Ecin Industries, Inc.*, 704 A.2d 747, 758 (R.I.1997).

**14.** Rule 706 of the Rhode Island Rules of Evidence provides, in pertinent part: "Court appointed experts. (a) *Appointment.* The court may appoint * * * expert witnesses of its own selection."

Subsection (b) of this rule details the compensation:

> "*Compensation.* Expert witnesses so appointed are entitled to reasonable compensation in whatever sum the court may allow. The compensation thus fixed is payable from funds which may be provided by the State in criminal cases and civil actions and proceedings involving just compensation under the fifth amendment. * * * [T]he compensation shall be paid by the parties in such proportion and at such time as the court directs, and thereafter charged in like manner as other costs."

The rule also directs that, "[I]n the exercise of its discretion, the court may authorize disclosure to the jury of the fact that the court appointed the expert witness." R.I.R. Evid. 706(c).

**15.** For further discussion on the issue of retaining court-appointed experts pursuant to Rule 706, see Ellen E. Deason, *Court–Appointed Expert Witnesses: Scientific Positivism Meets Bias and Deference*, 77 Or. L.Rev. 59 (1998); Margaret G. Farrell, *The Function and Legitimacy of Special Masters: Administrative Agencies for the Courts*, 2 FALL Widener L. Symp. J. 235 (1996); Note, *Improving Judicial Gatekeeping: Technical Advisors and Scientific Evidence*, 110 Harv. L.Rev. 941 (1997).

Here, defendant argued that the trial justice erred in admitting two reports announcing the suspension of certain uses of 2,4,5–T by the USDA and the EPA. The defendant argued that these documents did not fall within the public records and reports exception to the hearsay rule, R.I.R. Evid. 803(8)(C), because they were not final reports, they were not conducted by the USDA or the EPA, and they were not trustworthy.

The wording of Rule 803(8)(C) and the Advisory Committee's Note to this rule do not indicate that the public records and reports exception to the hearsay rule applies only to "final" reports. Rather, the Advisory Committee's Note to Rule 803(8)(C) states that several factors should be considered in assessing admissibility and points out that the rule "assumes admissibility in the first instance but with ample provision for escape if sufficient negative factors are present." Here, defendant has merely alleged that the reports are untrustworthy without pointing to any examples or substantiating its assertions. Moreover, the determination of relevance is within the discretion of the trial justice and such a determination will not be overturned unless there is evidence of a clear abuse of that discretion. *Bourdon's*, 704 A.2d at 758. In our opinion, the trial justice did not abuse her discretion by determining that the suspension reports were relevant.

The defendant also challenged the admission into evidence of the former testimony of certain past Dow employees who were deposed in connection with *In re "Agent Orange" Product Liability Litigation*, 611 F.Supp. 1223 (E.D.N.Y.1985), cert. denied, 487 U.S. 1234, 108 S.Ct. 2899, 101 L.Ed.2d 932 (1988). The defendant advanced the argument that these depositions should not have been admitted under the R.I.R. Evid. 804(b)(1) *"former testimony"* hearsay exception because they were not taken "in compliance with law." Spe-cifically, the special master appointed in the Agent Orange litigation reportedly ordered that the deponents and their counsel be allowed the opportunity to examine documents about which the deponents would be questioned in advance of the depositions, but that order was not followed. It is our opinion that this alleged violation of the special master's orders did not render the deposition not "in compliance with law." Therefore, the testimony was properly admitted under the former testimony exception to the hearsay rule, Rule 804(b)(1), and thus the trial justice did not abuse her discretion in determining that this evidence was relevant.

In addition, Dow argued that the trial justice erred in allowing plaintiffs to introduce "failure to warn" evidence [16] and argued that this evidence should not have been admitted because all plaintiffs' failure to warn claims were preempted by FIFRA. As explained *ante*, the appropriate FIFRA statute is the 1964 enactment, wherein no implied preemption of state law causes of action is found. Therefore, the admission of failure to warn evidence was not error.

The defendant also maintained that the trial court erred when it allowed plaintiffs to introduce "other cancer" evidence. Dow contended that such evidence should have been excluded because it was irrelevant and/or highly prejudicial under Rule 403. But defendant cited only two instances when this "other cancer" evidence was admitted—T. 220–222 and T. 412–421—in over 1500 pages of transcripts. Moreover, the "objectionable" testimony was extremely limited, and objections were raised at both points. In the first instance, the judge directed plaintiffs' counsel to reframe the question as narrowly as possible. In the second instance, the judge ordered that a particular answer be stricken from the record. In both instances, the answers given by the witness explained the relevance of information on the other form

---

**16.** Pursuant to Rule 46 of the Superior Court Rules of Civil Procedure, defendant filed a notice of continuing objection to admission of the failure to warn evidence.

of cancer discussed to myeloma. We have repeatedly held that determinations of relevance and prejudice are within the sound discretion of the trial justice, and such determinations will be upheld absent a showing of an abuse of this discretion, which did not occur here.

We have also examined defendant's other objections to certain admitted evidence, and we conclude that they are without merit.

### Jury Instructions

The defendant claimed that in instructing the jury, the trial justice erred by referring to the generic chemical "245–T" rather than to the specific product manufactured by defendant. While the trial justice did use the generic term, her instructions to the jury made clear that the jury was to consider only 2,4,5–T products that were manufactured by defendant. The first jury interrogatory, for example, states: "Do you find that Plaintiff has proven, by a fair preponderance of the credible evidence, that the *Defendant manufactured and sold 245–T* at any time during the period 1968 through 1972, and that Plaintiff *used 245 T manufactured by Defendant* in his work at L.H. Meader Tree Company?" (Emphases added.) These interrogatories were worded to ensure that the jury did not render its verdict in the mistaken belief that it was being asked to consider Agent Orange or 2,4,5–T manufactured by another chemical company.

The defendant also argued that it was prejudiced when the trial court instructed that defendant could be found liable for failure to warn of "the danger" of 2,4,5–T, and contended that on that occasion the trial justice should have said "alleged danger." Both parties, however, agreed that the trial justice used "alleged" together with "danger" at all other relevant points. It is well settled that "[a]n erroneous charge warrants reversal only if it can be shown that the '"jury could have been misled" to the resultant prejudice of the

complaining party.'" *Brodeur v. Desrosiers,* 505 A.2d 418, 422 (R.I.1986). As a whole, the instructions adequately directed the jury that its task was to determine whether 2,4,5–T posed a danger. Accordingly, we hold that this single omission of the word "alleged" did not constitute reversible error.

The defendant also claimed that the trial justice's causation instructions, specifically, the proximate causation instructions, were in error. Viewing the instructions as a whole, however, it is our opinion that the trial justice properly instructed the jury on the issue of proximate causation. For each of the claims, the trial justice explained that the jury was required to find proximate causation. The trial justice offered several definitions of proximate causation, including, that "[u]nder Rhode Island law in order to prove proximate cause, plaintiff must prove by a preponderance of the evidence that but for the breach of the implied warranty, the injury complained of would not have occurred." At another point, the court instructed that "[a]n injury is proximately caused by an act or a failure to act whenever it appears from the preponderance of the evidence that act or omission in natural, unbroken and continuous sequence produced the event about which complaint is made." In *Wells v. Uvex Winter Optical, Inc.,* 635 A.2d 1188, 1191 (R.I.1994), this Court reversed a judgment based on a jury verdict on the ground that the trial justice's instruction on proximate cause was deficient because it "did not specifically emphasize that Uvex's actions * * * must have been a substantial or primary cause of Wells' injuries." The Court explained that *Redgrave v. Boston Symphony Orchestra, Inc.,* 855 F.2d 888 (1st Cir.1988), provided an example of an adequate proximate cause instruction: an action constituted a proximate cause of injury only if the " 'harm would not have occurred *but for* the [breach] *and that the harm was a natural and probable consequence* of the [breach].'" *Wells,* 635 A.2d at 1191 (quot-

ing the instruction given in *Redgrave* ). Furthermore, during deliberations, the jury twice asked for additional instructions on "proximate causation." The first time, the trial justice wrote, without objection: "Before plaintiff can recover damages, he has the burden of proving by a preponderance of the evidence that his injuries were proximately caused by exposure to the chemical. Plaintiff must show that his multiple myeloma *would not have occurred in the absence of the exposure* to the chemical." (Emphasis added.) The second time, the trial justice instructed: "Proximately pertains to that which in an *ordinary, natural sequence* produces a specific result." (Emphasis added.)

Clearly, the instructions by the trial justice required the jury to find "but for" causation and that defendant's "act or omission in natural, unbroken and continuous sequence produced the event." Furthermore, for each of the claims in the jury interrogatories, the jury was required to find that the conduct was the proximate cause of plaintiff's injuries. Therefore, we hold that the jury was adequately instructed about the applicable law.

The defendant also cited other purported errors in jury instructions with respect to the failure to warn and to give notice. Pursuant to our discussion *ante,* we find these claims to be without merit.

### Denial of Motions for a Judgment as a Matter of Law and for a New Trial

We have reviewed defendant's position that the trial justice erred in denying its motions for judgment as a matter of law and its motion for a new trial, and we have examined whether competent evidence supported the verdict. The trial justice in each instance applied the correct analyses in denying these motions.

### Conclusion

For the foregoing reasons, we deny and dismiss the defendant's appeal, and we affirm the judgment of the Superior Court to which we return the papers in the case.