### In re MACKENZIE C.

### Nos. 2003–138–Appeal, 2000–452–M.P.

Supreme Court of Rhode Island.

July 18, 2005.

Thomas J. Corrigan, Jr., Esq., Lincoln, for Petitioner, DCYF.

Stephen R. Famiglietti, Esq., for Respondents.

Frank P. Iacono, Jr., Esq., for Guardian ad litem, CASA.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

SUTTELL, Justice.

A nine-week-old baby girl is horrifically injured—nineteen fractures with no immediate explanation about how the injuries occurred, no smoking gun to cast blame on a depraved perpetrator. This case brings into sharp focus the inherent difficulties of our legal system, as well as its strengths, as it attempts to sort through the myriad vexations of human affairs that it is called upon to adjudicate in its search for the truth. Here, the right of the child, Mackenzie, to a safe, nurturing, and protective environment seemingly collides with the constitutionally protected, fundamental liberty interest of her parents in the care and custody of their child. *See Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).

The daunting responsibility of protecting Mackenzie, as well as all children in this state who may be neglected and abused, falls upon the Department of Children, Youth and Families (DCYF). In this case, shortly after being notified of the child's injuries, DCYF filed an *ex parte* petition in Family Court seeking commitment of the child, thereby launching a complex, Dickensian, procedural journey. DCYF subsequently filed a second petition

seeking the termination of parental rights (TPR) on the grounds that both parents were unfit because of cruel and abusive conduct. The two petitions were consolidated and tried before a justice of the Family Court, after which the trial justice issued a lengthy and comprehensive written decision. After recounting the testimony of the various witnesses, the trial justice specifically rejected the opinion of the parents' medical expert that Mackenzie's injuries were caused by a condition that he had diagnosed as "temporary brittle bone disease," a term that he himself had coined, and one that he conceded was "still a controversial subject."

The trial justice also made a series of factual findings, including: the fractures were not accidental; the parents, by inference, "being the principal caretakers of [the] child, either individually or jointly, caused or allowed to be caused, the injuries"; and "[t]he parents are unfit at this time by reason of conduct or conditions seriously detrimental to the child, which resulted in cruel and abusive conduct to the child." Finally, the trial justice granted the abuse petition, but deferred a decision on the TPR pending "an impartial psychiatric—psychological evaluation of both parents." Both parties appealed from the Family Court order, and DCYF filed a petition for certiorari.

The parents cooperated with the evaluation, and additional hearings were held at which the court-appointed psychiatrist testified, as well as a psychiatrist presented by DCYF. As a result of these hearings, the trial justice determined that "at this time the appropriate direction to take in order to determine whether or not ultimately the termination petition should be dismissed is to have DCYF prepare a case plan reflecting the testimony of [the court-appointed psychiatrist]." Because the recommendation of this psychiatrist was for a

gradual, monitored reunification, DCYF filed an amended petition for writ of certiorari and a motion for stay of the case plan order. This Court issued the writs, granted the motion for stay, and deferred certification of the files until the TPR petition had been decided on the merits.

The trial justice allowed each party the opportunity to present more witnesses on the issue of the best interests of the child. On November 1, 2001, he issued a fifty-three page written decision in which he found that "there is absolutely no evidence whatsoever to indicate, at this time, that the child is at risk if the child was, in fact, reunified with her parents." He also found that "the physical, psychological, mental and intellectual needs of the child are best served by reunification with the parents." Accordingly, he dismissed the TPR petition and ordered DCYF to "immediately commence work on a reunification plan." He left undisturbed, however, his findings and orders entered in the underlying abuse petition.

More hearings were held in Family Court over the next several months on the formulation and approval of a reunification plan, during which time the parties frequently found their way to this Court requesting stays. On February 27, 2002, we granted a stay and ordered a briefing schedule. The parents later filed a motion to remand the case so that the Family Court could consider their motion for a new trial and/or reconsideration. This Court did remand the case, whereupon the trial justice granted the parents' motion to reconsider the abuse petition, permitted the parties to engage in discovery, and entertained additional testimony on three dates in November 2003 and January 2004. After all parties had submitted memoranda, the trial justice issued a third comprehensive written decision in which he carefully considered the testimony of

the parents' expert medical witness, and was "convinced by the medical testimony produced at these hearings by the respondent parents that the testimony is, in fact, clear, direct, weighty and convincing as to what this child was suffering from and which, therefore, led to the fractures that she sustained." He therefore reversed his initial ruling, found that DCYF had failed to sustain its burden of proof, and dismissed the abuse petition.

After reviewing forty-five volumes of transcripts and the three written decisions of the trial justice, we are of the mind that the justice system has worked perhaps as well as can be expected in this very troubling situation. There can be little doubt that the justice system is an imperfect vehicle for resolving such issues, but resolve them it must. Here, we find little to fault in the zealous advocacy of all parties involved—DCYF, legal counsel, and social workers alike, for their efforts to protect Mackenzie's safety; parents' counsel for affirming the constitutionally protected rights of the parents; and the guardian ad litem for advocating for the child's best interests. We also recognize the formidable responsibility thrust upon the trial justice, and conclude that he presided over this case in a most thoughtful and professional manner.

For our purposes on review, the issues in this voluminous, complex case may be boiled down to a few fundamental principles. We are well satisfied that all parties received a fair trial and that the trial justice carefully analyzed the various evidence and made some difficult, no doubt agonizing, decisions. Moreover, his rulings on the admissibility of evidence, his determination of the credibility of witnesses, his decision to reopen the case, and particularly his assignment of greater weight to the expert opinions of one party than to those of another are all within a trial justice's discretionary authority. Here, after reconsidering his earlier decision on the abuse petition and hearing new evidence, the trial justice concluded that DCYF had not met its burden to prove the allegations in its petition by clear and convincing evidence. We see no valid reason to disturb his finding. Accordingly, we affirm.

## Facts

On December 24, 1998, Susan and Paul C. brought their nine-week-old daughter, Mackenzie, to the emergency room at Hasbro Children's Hospital. The child was crying uncontrollably and seemed to have something wrong with her right arm. Radiological studies revealed an acute right humerus mid-shaft fracture and evidence of eighteen additional fractures in various stages of healing. The child did not exhibit any bruising or swelling. The treating physician filed a physician's "report of examination" and placed Mackenzie on a seventy-two-hour hold pursuant to G.L.1956 § 40–11–5(a) and § 40–11–6(c).

A verbal *ex parte* order of detention was issued by a Family Court justice on December 25, 1998. DCYF filed an *ex parte* abuse and neglect petition on December 28, 1998. A probable cause hearing was begun on January 8, 1999, but was discontinued at the request of the parents. Initially, the treating physicians suspected that the child suffered from Osteogenesis Imperfecta; that diagnosis was later ruled out, however, and, in February 1999, the treating physicians opined that the child suffered from "battered child syndrome." On April 12, 1999, DCYF filed a TPR petition, which alleged parental unfitness because of cruel or abusive conduct pursuant to G.L.1956 § 15–7–7(a)(2)(ii). On June 11, 1999, the trial justice granted DCYF's motion to amend the TPR petition to include an allegation of parental unfitness because of aggravated circumstances

pursuant to § 15–7–7(a)(2)(v), and granted DCYF's motion to consolidate the commitment petition with the TPR petition for trial.

The trial was conducted over twenty days, beginning on June 11, 1999, and concluding on March 23, 2000. The parties submitted written closing arguments and, on September 14, 2000, the trial justice issued a written decision. The trial justice found that "the parents, being the principal caretakers of this child, either individually or jointly, caused or allowed to be caused, the injuries to this child, to wit, 19 fractures." The trial justice found that "[t]he child suffered from no abnormal bone disease such as osteogenesis imperfecta," and "did not suffer from any metabolic or endocrinology conditions." The trial justice found that the testimony of the parents' only expert, Dr. Colin Paterson, that the child suffered from "temporary brittle bone disease" did not meet the test of *DiPetrillo v. Dow Chemical Co.*, 729 A.2d 677 (R.I.1999), and therefore the trial justice gave no probative weight to his testimony. The trial justice specifically noted that Dr. Paterson himself conceded that "temporary brittle bone disease" was still a "controversial subject" that had been extensively criticized by other doctors and that he could not give a definitive answer to the question of whether "temporary brittle bone disease" was generally accepted in the "scientific-medical community."

The trial justice observed, however, "that, at this time, we may be dealing with a difficult area of medical science. That it is possible that in five years or so, any difficulties may be resolved to the satisfaction of the entire scientific-medical community. However, unlike Columbus or Galileo, this Court must base its decision on the current state of the law and medical science and not untested, unaccepted theories."

The trial justice also found that "the conduct of the parents to the child was of a cruel and abusive nature" and the "parents are unfit at this time by reason of conduct or conditions seriously detrimental to the child, which resulted in cruel and abusive conduct to the child." As a result of the finding of physical abuse, the trial justice committed Mackenzie to DCYF's care, custody, and control.

The trial justice deferred his decision on the TPR petition, however, "until it had the benefit of an impartial psychiatric-psychological evaluation of both parents." On October 13, 2000, an order was entered, embodying the trial justice's findings, and including the trial justice's order that the parents undergo a psychiatric-psychological evaluation by a court-appointed expert.

The parents filed a motion for reconsideration and/or new trial on September 22, 2000, and a notice of appeal on October 3, 2000. On December 8, 2000, the trial justice granted the parents' oral request for deferral of argument and decision on their motion for reconsideration and/or new trial. On November 2, 2000, DCYF filed a cross-appeal of the September 14, 2000 decision.

The parents attended their evaluation with the court-appointed psychiatrist, Dr. Bernard Katz, on November 13, 2000. On January 8, 2001, the trial justice, after hearing the testimony of Dr. Katz and DCYF's rebuttal witness, Dr. Ronald M. Stewart, issued a bench decision concerning the TPR petition. The trial justice accepted Dr. Katz's recommendation that "both the [c]ourt and DCYF retain oversight of this family in a gradually diminishing fashion for a period perhaps of three years." The trial justice said that "at this time the appropriate direction to take in order to determine whether or not ulti-

mately the termination petition should be dismissed is to have DCYF prepare a case plan reflecting the testimony of Dr. Katz. We will then be in a position to review the proposed case plan. If it meets the approval of the respondents and the [c]ourt, then the [parents] will then be under a[c]ourt order to comply with the provi-. sions of the case plan." The trial justice requested that DCYF prepare a case plan within two weeks. Counsel for DCYF asked the trial justice to stay the order for a case plan, which the trial justice denied.

On January 12, 2001, DCYF filed an amended petition for certiorari and a motion for stay of the reunification plan order.[1] On January 18, 2001, a duty justice of this Court ordered a stay of the January 8, 2001 reunification plan order. On March 9, 2001, this Court continued the stay of enforcement of the January 8, 2001 Family Court order. This Court ordered that the certification of the Family Court files be deferred until such time as the Family Court justice shall proceed to hear and determine the termination of parental rights on the merits. In response to the parents' request for clarification, this Court, on May 3, 2001, directed the Family Court to decide the TPR petition on the merits, after which the pending motions for reconsideration and/or new trial with respect to the neglect petition and for further medical evaluation of Mackenzie might be addressed by the Family Court.

The trial justice set a hearing schedule with respect to the TPR petition, allowing both parties to present more witnesses on the issue of the child's best interests. On November 1, 2001, after hearing three days of testimony, the trial justice issued his decision denying the TPR petition. An order embodying that decision was entered on November 8, 2001. The trial justice found that Mackenzie "deeply loves the [parents], and they deeply love her" and that "there is no evidence whatsoever that at this time, the parents create any risk or constitute any risk to the child if there is reunification." The trial justice found that DCYF "failed to prove that the best interests of the child would be served by terminating the relationship between the child and the [parents]" and "that the physical, psychological, mental and intellectual needs of the child are best served by reunification with the parents * * *." The trial justice ordered DCYF to "immediately commence work on a reunification plan * * * [which] include[s] a gradual return of the child to the respondent parents."

On November 8, 2001, DCYF filed an appeal from the order of November 1, 2001, and on November 20, 2001, DCYF filed a motion for stay of that order. A duty justice of this Court denied the motion for stay on November 29, 2001. On December 5, 2001, DCYF submitted a case plan that required the parents to admit their abusive behavior and to begin treatment to address those issues, and made reunification contingent on DCYF's subsequent approval. The trial justice took exception to the DCYF plan and indicated that DCYF had "either intentionally or unintentionally chosen to ignore the court's directive as to the contents of the reunification plan. Nowhere do I see in that plan that there is any initial step towards gradual reunification." The trial justice ordered DCYF to rewrite the plan, and then, still not satisfied with the visitation schedule contained in the revised plan, ordered that the plan include gradually increasing supervised visitations, including overnight visits. The trial justice also ordered the

---

1. On November 6, 2000, DCYF filed a petition for certiorari with respect to the court-or- dered psychiatric evaluations.

plan to include a provision that the parents undergo a parent-child evaluation and attend any treatment recommended by the evaluator. The trial justice also denied DCYF's oral motion to stay the implementation of the case plan.

On January 16, 2002, DCYF filed with this Court a motion to stay the December 17, 2001 order. This motion to stay was denied by a duty justice of this Court, but later was granted by the full Court on February 27, 2002. This Court also ordered that the appeal in this case be expedited. On July 28, 2003, the parents filed a motion to remand the case to the Family Court for disposition of their motion for reconsideration and/or new trial. On September 16, 2003, this Court remanded the matter to the Family Court and ordered that the trial justice hear the motion "as soon as practicable."

On October 23, 2003, the trial justice, after reviewing the parties' briefs and oral arguments, granted the parents' motion to reopen the case. The trial justice found that the ability of the parents' proffered expert, Dr. Cathleen Raggio, "to form any opinion with respect to the issue involved in this case could not have occurred until sometime after the conclusion of the testimony in this case, sometime around March of 2000." Therefore, the trial justice concluded, "it would have been physically impossible for the [parents] to [have] know[n] this evidence at the time of trial." The trial justice also found that this newly discovered evidence, if admitted, "indicates that the findings would, in fact, be changed and the decision would, in fact, be opposite to the decision rendered by this [c]ourt * * *." Thereafter, the trial justice allowed the parties to engage in discovery, heard testimony for three days in November 2003 and January 2004, and reviewed written closing arguments. On January 23, 2004, after hearing the extensive direct examination of Dr. Raggio, the trial justice concluded that Dr. Raggio arrived at her opinions in " 'what appears to be a scientifically sound and methodologically reliable manner,' " see Owens v. Silvia, 838 A.2d 881 (R.I.2003), and admitted her testimony over the objection of DCYF. DCYF then vigorously cross-examined Dr. Raggio.

On November 5, 2004, the trial justice issued a written decision in which he reversed his earlier decision on the petition alleging abuse and neglect. The trial justice explained that his earlier decision was not based on direct evidence of abuse, but rather, on an inference from the fact that the parents were the principal caretakers of the child since birth. The trial justice further noted that "[t]here was no competent medical evidence to support the position of the [parents] when the decision was rendered on September 14, 2000." "This [c]ourt made its decision without the benefit of direct evidence of abuse but relying on the Supreme Court cases holding that the trial court may draw a reasonable inference that the alleged child abuse was inflicted upon the child by the parent or parents who were the principal caretakers of the child since birth."

In reconsidering his earlier decision, the trial justice addressed two issues, "[w]hether the expert testimony and opinion of Dr. Raggio is admissible in that it is based on scientifically valid methodologies or principles and is sufficiently tied to the facts at issue in this case" and "[i]f, in fact, Dr. Raggio's testimony is based on scientifically valid methodologies or principles and is sufficiently tied to the facts at issue in this case, had DCYF then sustained its burden of proof with respect to the abuse by clear and convincing evidence."

In revisiting his decision to admit Dr. Raggio's testimony, the trial justice first examined Dr. Raggio's credentials and found them "most impressive." He specif-

ically noted that Dr. Raggio was an "Assistant Scientist—Research Division, at the Hospital for Special Surgery" in New York City (ranked as the number two hospital in the country in orthopedics), had published extensively in the "area of bones and other orthopedic issues," spent 30 percent of her time doing research, saw on average seventy to eighty patients per week with bone-related problems, that her patients ranged in age from birth to sixteen years old, and that "a significant number of cases referred to her over the past seven years involved children with fractures suspected to be the result of child abuse."

In his November 5, 2004 decision, the trial justice reviewed the testimony of Dr. Raggio, along with the evidence presented in the earlier trial, and concluded that:

> "This Court is, in fact, convinced by the medical testimony produced at these hearings by the respondent parents that the testimony is, in fact, clear, direct, weighty and convincing as to what this child was suffering from and which, therefore, led to the fractures that she sustained. There is absolutely no testimony with respect to any tendency of the parents to be abusive. There is absolutely no testimony to indicate what the parents may have done to be abusive. The only testimony was the testimony that the parents were the principal caretakers of the child at the time the child suffered the fractures. There is now testimony explaining the child's evolving medical condition which, in fact, led to the fractures while in the course of the normal handling and everyday activities."

> "This Court is convinced that the State has failed to sustain its burden of proof by clear and convincing evidence. Therefore, the petition filed by the State through its Department of Children,

Youth and Families is denied and dismissed."

After receiving the November 5, 2004 decision, DCYF filed a motion for stay, which the trial justice granted. No further orders were entered until a duty justice of this Court remanded the case "for the entry of orders for the protection of the parties and disposition of the custody of the child pending the appellate proceedings * * *." On December 29, 2004, the trial justice issued a detailed follow-up order making provision for visitation and for gradual reunification of the parents and child. DCYF filed with this Court a motion to stay, which was granted temporarily by a duty justice of this Court. On January 7, 2005, this Court granted DCYF's motion to stay the December 29, 2004 order, and assigned this case for briefing and oral arguments.

DCYF has raised several issues in its appeal, essentially arguing that the trial justice was correct in his original finding of abuse, but erred in finding that termination of parental rights was not in the child's best interests, and further erred in dismissing the abuse petition upon reconsideration. Because we deem this latter contention dispositive, we need address only the following issue—whether the trial justice erred in dismissing the abuse petition after reconsidering the parents' new evidence.

### Admissibility of Dr. Raggio's Expert Testimony

■ DCYF challenges both the trial justice's decision to admit Dr. Raggio's testimony and his reliance on that testimony to support his finding that DCYF did not sustain its burden of proving that Mackenzie's fractures were caused by physical abuse. First, DCYF avers that the "trial justice erred in admitting the testimony of Dr. Raggio based on her failure to estab-

lish a valid methodology to test her theories, including her inability to test her theory, paucity of peer review, unknown rate of error, lack of general acceptance in the orthopedic community[,] and the fact that her unique opinions, which she as a published researcher has never submitted to any journal, was created merely for purposes of testifying."

In admitting Dr. Raggio's testimony, the trial justice first cited Dr. Raggio's "superb credentials in her field," and noted that "there is no indication before this Court that novel theories or junk science is being proposed." The trial justice interpreted the thrust of Dr. Raggio's testimony as applying the known scientific principles of bone development and disease to the facts of this case "including the signs and symptoms that we have found this child to have in the past and * * * developing at the present, as well as the family history." The trial justice concluded that "in combining all of these factors, [Dr. Raggio is] in a position to now conclude on the basis of a known scientific diagnosis where it applies in this case."

■ In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the United States Supreme Court held that, under the Federal Rules of Evidence, a trial justice, in admitting expert testimony, acts as a "gatekeep[er]" to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but [also] reliable." "This Court has recognized the applicability of *Daubert* to situations in which scientific testimony is proposed in Rhode Island state courts." *Raimbeault v. Takeuchi Manufacturing Ltd. (U.S.),* 772 A.2d 1056, 1061 (R.I.2001). Rule 702 of the Rhode Island Rules of Evidence

governs the admission of expert testimony in Rhode Island courts. Rule 702 provides:

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of fact or opinion."

"The purpose of expert testimony is to aid in the search for the truth. It need not be conclusive and has no special status in the evidentiary framework of a trial." *Owens,* 838 A.2d at 890 (quoting *Morra v. Harrop,* 791 A.2d 472, 477 (R.I.2002)). "The primary function of the trial justice's gatekeeping role is to assure that the proposed expert testimony, presented as a scientifically valid theory, is not mere 'junk science.'" *Id.* at 891. "As a result, the trial justice must ensure that the parties present * * * only expert testimony that is based on ostensibly reliable scientific reasoning and methodology." *Id.*

■ If a party seeks to introduce "novel or highly complex scientific or technical expert testimony," *Owens,* 838 A.2d at 891, "the trial justice may admit the expert testimony only if the expert proposes to testify 'to (1) scientific knowledge that (2) will assist the trier of fact.'" *Id.* (quoting *DiPetrillo,* 729 A.2d at 687).[2]

■ In addressing the first part of the inquiry, often referred to as the "reliability" test, the trial justice examines four non-exclusive factors in determining whether expert testimony about novel or technically complex theories or procedures possesses scientific validity. "They are: (1) whether the proffered knowledge has

---

2.  "Helpfulness to the trier of fact is the most critical consideration for the trial justice in determining whether to admit proposed expert testimony." *Owens v. Silvia,* 838 A.2d 881, 891 (R.I.2003).

been or can be tested; (2) whether the theory or technique has been the subject of peer review and publication; (3) whether there is a known or potential rate of error; and (4) whether the theory or technique has gained general acceptance in the scientific community. * * * Satisfaction of one or more of these factors may be sufficient to admit the evidence and each factor need not be given equal weight in the analysis. * * * The court may also consider the qualifications of the expert in determining whether the underlying methods are reliable." *Owens*, 838 A.2d at 891–92 (citing *DiPetrillo*, 729 A.2d at 689). In addressing the second part of the inquiry, the trial justice examines whether the expert's testimony is "sufficiently tied to the facts of the case that it will aid the [factfinder] in resolving a factual dispute." *Id.* at 891 n.3 (quoting *DiPetrillo*, 729 A.2d at 689). "If the testimony 'logically advances a material aspect of the proposing party's case,' * * * the court may deem it relevant and admissible." *Id.* (quoting *DiPetrillo*, 729 A.2d at 689).

▮▮▮ "A trial justice's ruling on the admissibility of an expert witness's proffered testimony 'will be sustained provided the discretion has been soundly and judicially exercised, that is, if it has been exercised in the light of reason applied to all the facts and with a view to the rights of all the parties to the action, * * * and not arbitrarily or willfully, but with just regard to what is right and equitable under the circumstances and the law.'" *Owens*, 838 A.2d at 890 (quoting *Morra*, 791 A.2d at 476–77).

Here, a factual dispute existed about the cause of the child's fractures, and Dr. Raggio was qualified, based on her impressive credentials, to opine about the cause of those injuries. Doctor Raggio based her opinion about the child's disorder and the cause of her fractures on: a review of

scientific literature; a physical examination of the child; the medical history of the child and her family, including the child's recent diagnosis of tenosynovitis and joint laxity along with indications of intrauterine crowding caused by a short umbilical cord and a fibroid tumor; and the results of her own research on bone disorders and laxity. The trial justice noted that Dr. Raggio's "testimony did not involve any new and esoteric medical conditions," but rather, involved "a better understanding and knowledge of existing conditions and their impact upon the patient." The trial justice found that the testimony of Dr. Raggio "appears to be scientifically sound and methodologically reliable."

▮▮▮ In this case, we conclude that the trial justice did not abuse his discretion in admitting Dr. Raggio's testimony. The trial justice reviewed Dr. Raggio's credentials and the method through which she arrived at her opinion and found them to be scientifically sound and methodologically reliable. As we have noted, "[t]rial justices are not required to become scientific experts" in determining the admissibility of expert testimony. *Owens*, 838 A.2d at 892. "The proponent of the evidence need only show that the expert arrived at his or her conclusion in what appears to be a scientifically sound and methodologically reliable manner." *Id.* The trial justice's focus is not on the ultimate conclusion of the expert, but rather, whether the reasoning used in forming the expert conclusion was sound. *Id.* at 896 (citing *DiPetrillo*, 729 A.2d at 689–90). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* at 892 (quoting *Daubert*, 509 U.S. at 596, 113 S.Ct. 2786).

Moreover, it is clear that Dr. Raggio's opinions were "sufficiently tied to the facts of the case" that they would aid the trial justice in resolving the factual dispute about the cause of the child's fractures. As we previously have stated, "[t]he purpose of expert testimony is to aid in the search for the truth." *Owens*, 838 A.2d at 890 (quoting *Morra*, 791 A.2d at 477). "If the testimony 'logically advances a material aspect of the proposing party's case,' * * * the court may deem it relevant and admissible." *Id.* at 891 n.3 (quoting *DiPetrillo*, 729 A.2d at 689). Consequently, we conclude that the trial justice soundly and judicially exercised his discretion in the light of reason applied to all the facts, with a view to the rights of all the parties to the action, and with just regard to what is right and equitable under the circumstances and the law.

### Dismissal of Abuse Petition

■ DCYF argues that the trial justice erred in dismissing the abuse petition after considering the parents' new evidence. DCYF contends that the evidence does not support Dr. Raggio's diagnosis of Ehlers–Danlos Syndrome (EDS) or her hypothesis that EDS contributed to the child's nineteen fractures. Consequently, DCYF contends that the trial justice erred in reversing his earlier determination that "the conduct of the parents to the child was of a cruel and abusive nature" and that the "parents are unfit at this time by reason of conduct or conditions seriously detrimental to the child, which resulted in cruel and abusive conduct to the child."

■ "In reviewing an appeal from a decree of the Family Court, we examine the record to determine whether legally competent evidence exists in it to support findings made by the trial justice." *In re Robert S.*, 762 A.2d 1199, 1200 (R.I.2000). These findings "are entitled to great weight and will not be reversed on appeal unless the justice overlooked or misconceived material evidence, or was otherwise clearly wrong." *In re Isabella C.*, 852 A.2d 550, 555 (R.I.2004).

After our review of the record, we are satisfied that the trial justice was acting within his discretionary authority in reversing his earlier finding of abuse. Of significant importance in this case is the fact that the trial justice, in reaching his initial finding of abuse, found no direct evidence of abuse on the part of the parents. In his initial written decision, the trial justice explicitly stated that "there was no direct evidence that the alleged child abuse was committed by the parents—acknowledged to be the principal caretakers of this child since birth." The trial justice noted that the lab tests and the opinions of DCYF's experts established that the child did not suffer from a bone disease, metabolic disorder, genetic disorder, or other medical condition that would account for the nineteen fractures. The trial justice found "absolutely no medical evidence" to support the opinion of the parents' expert witness, Dr. Colin Paterson, that the child suffered from "temporary brittle bone disease." Instead, the trial justice drew a permissible inference that "the parents have inflicted or allowed to be inflicted upon the child, physical injury" and that their conduct was "of a cruel and abusive nature." The trial justice couched his findings, however, by recognizing that this case involved a "difficult area of medical science" and prophesized that "it is possible that in five years or so, any difficulties may be resolved to the satisfaction of the entire scientific-medical community."

Four years later, the testimony of Dr. Raggio convinced the trial justice that the child's fractures were not caused by abuse, but rather, were caused by a medical con-

dition that led to the fractures in the course of "normal handling and everyday activities." After reviewing the extensive record and voluminous transcripts, we conclude that legally competent evidence exists to support the findings of the trial justice.

Doctor Raggio testified that, in her opinion, based upon reasonable medical certainty, Mackenzie suffered from an "Ehlers–Danlos type syndrome" and combined with intrauterine conditions, namely a short umbilical cord and a fibroid tumor that restricted her movement before she was born, she had "abnormal bone," which resulted in her suffering fractures in the course of normal handling. Doctor Raggio based her conclusion that the child had this "Ehlers–Danlos type syndrome" on a full orthopedic examination of the child, which revealed that the child had loose ligaments and a grayish sclera, the medical history of the child's mother, a review of medical literature, and the fact that the child was diagnosed with tenosynovitis in November 2003. Moreover, Dr. Raggio testified that many of the child's fractures were "symmetrical" and that with abnormal bone "it's easy to get that kind of fracture." This testimony about the significance of the symmetrical nature of the fractures was bolstered by the testimony of Dr. Patricia Solga, DCYF's expert witness, who testified that symmetrical fractures are "very likely" to be seen when bones are abnormal.

Consequently, given the lack of direct evidence that the parents abused the child, combined with the expert medical testimony explaining the child's condition, we discern no error on the part of the trial justice in denying and dismissing the abuse petition filed by DCYF for failing to sustain its burden of proof by clear and convincing evidence.

We have no need to address the parties' arguments about the trial justice's denial of the petition for termination of parental rights.[3] Before "permanently sever[ing] the rights of a parent in his or her natural children, the state must prove by clear and convincing evidence that the parent is unfit." *In re Russell S.*, 763 A.2d 648, 649 (R.I.2000) (quoting *In re Nicole B.*, 703 A.2d 612, 615 (R.I.1997)); *see also* § 15–7–7; *In re Kyle S.*, 692 A.2d 329, 333 (R.I. 1997) (noting that a "judicial finding of parental unfitness is a condition precedent to the involuntary termination of parental rights").

## Conclusion

As we indicated at the outset of this opinion, this is a difficult and very troubling case and one in which there can be no absolute certainty about the future for this young girl. We are confident, however, that all parties were provided ample opportunity to present their evidence to the court, and that the trial justice gave due deliberation to the arguments advanced by each side. Indeed, both DCYF and the parents produced well-credentialed medical experts to support their respective positions. In the end, the trial justice accepted the testimony of Dr. Raggio, finding that competent medical evidence is now available to explain Mackenzie's injuries that was not available four years earlier when he made his initial finding of abuse. The trial justice therefore reversed his initial decision, and found that DCYF had not proven the allegations of abuse by clear and convincing evidence. It undoubtedly was a difficult decision, but one that was within his sound discretion to

---

**3.** Likewise, we decline to address DCYF's asseveration that the trial justice erred in finding that the child's facial bruises were not caused by the parents. In its appellate brief, DCYF candidly admits that this finding is "inconsequential to the outcome of this case."

make. In affirming the decree, we are reminded of the sentiments of Ralph Waldo Emerson:

"[S]peak what you think to-day in words as hard as cannon balls, and to-morrow speak what to-morrow thinks in hard words again, though it contradict everything you said to-day." Essays by Ralph Waldo Emerson, *Self–Reliance* 35, 47 (James Monroe & Co. 1841) (The Classics of Liberty Library 1995).

Accordingly, we affirm the decrees dismissing both the termination petition and abuse petition, and remand the case to the Family Court.