**Supreme Court**

No. 2014-139-Appeal.
(09-421-2)
No. 2014-140-Appeal.
(09-421-3)

In re Emilee K.                    :

In re Jennifer K.                  :

NOTICE:    This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Supreme Court

No. 2014-139-Appeal.
(09-421-2)
No. 2014-140-Appeal.
(09-421-3)

In re Emilee K.               :

In re Jennifer K.             :

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## OPINION

**Justice Goldberg, for the Court.** These consolidated cases came before the Supreme Court on November 29, 2016,[1] on appeal by the respondent, Joseph K.[2] (respondent), from a Family Court decree finding that the respondent abused and neglected his daughters, Emilee, who was born on June 25, 2005, and Jennifer, born on March 7, 2007.[3] The Family Court justice committed the children to the care, custody, and control of the Department of Children, Youth, and Families (DCYF). For the reasons set forth herein, we affirm the decree of the Family Court.

### Facts and Travel

The facts of this case are as troubling as any this Court has encountered—a child who has been robbed of her innocence at age four-and-a-half, and apparently subjected to the undue

---

[1] These appeals were consolidated by an order of this Court entered on October 27, 2014.

[2] For the sake of privacy, the family members will be referred to by only their first names.

[3] Emilee's name is spelled differently throughout the Family Court record. However, we will refer to her in accordance with the caption on the petition.

influence of adults.  In September of 2011, the Rhode Island Child Abuse Hotline received reports that Jennifer had been sexually abused by her father.  The allegations were made by Dawn Grinnell (Grinnell), the director of preschool and prekindergarten programs at All Saints Academy, and Dr. Thomas Finnegan (Dr. Finnegan), the principal of All Saints Academy, where the girls attended school.

Jennifer's statements of abuse began on September 12, 2011.  Grinnell was supervising Jennifer's class when the child seized two undressed Barbie dolls and simulated sexual acts between them.  Jennifer explained that, while staying at her mother's house, she had watched a movie involving two naked women.  Although DCYF was not contacted at this time, Dr. Finnegan met with respondent to inform him of Jennifer's disclosures and to recommend that Jennifer and Emilee attend counseling sessions, a recommendation that had previously been made—in April of 2011—in the midst of respondent's divorce from the children's mother, Rachel K. (Rachel).  In the weeks following this revelation, Jennifer's behavior became more erratic.  During class one day, Jennifer emulated masturbation while repeatedly screaming "[g]ive it to me, baby."  On more than one occasion, Jennifer pulled her underpants to the side and exposed herself to fellow classmates.  Her behavioral problems also included increased incontinence issues and violent outbursts.  On September 19, 2011, Jennifer made a second allegation of abuse, telling Grinnell that respondent walks around the house naked and that she "hold[s] his unit" when he goes to the bathroom in the middle of the night.  Grinnell conveyed this disclosure to Dr. Finnegan, who contacted DCYF.

The DCYF began its investigation of respondent on September 19, 2011, based on the reported abuse.  Megan Dunn (Dunn), a child protective investigator for DCYF, was assigned to examine the reported abuse.  Dunn went to respondent's house around 6 p.m. to speak with

respondent and the girls. Emilee answered the door in her school uniform, but Jennifer came to the door in her underwear. The respondent came down the stairs, not wearing a shirt and buttoning his shorts. Dunn informed respondent that she was investigating allegations of child molestation and needed to speak with Jennifer and Emilee.

Dunn spoke with Jennifer for approximately thirty minutes, during which Jennifer asked if Dunn was there to "trap her father." Jennifer disclosed that she can see respondent's "unit" when he walks around, when she is in the bathroom with him, and when she gets into bed with him after having a nightmare. Jennifer identified her private parts as her "vajayjay" and "booty," but she denied being touched by respondent in either area. She also denied having to touch respondent in any way. Dunn asked Jennifer about the movie that she viewed while at her mother's house. Jennifer seized two female Barbie dolls and placed them on top of each other, stating that "they bend over and smell each other's vajayjay." After this statement, Jennifer became distracted and the interview ended.

Dunn then spoke with Emilee, who disclosed that her father walks around the house naked and sleeps naked, and that she can see respondent's "unit" and "booty" when he is naked. She denied ever being abused or touched inappropriately by her father or anyone else. Lastly, Dunn interviewed respondent, who denied having inappropriate contact with his children. Dunn spoke to respondent about Jennifer and Emilee's most recent disclosure—that he walks around the house naked. The respondent admitted that he sleeps naked but denied being naked in the house when the girls are present. Dunn informed respondent that nudity around Emilee and Jennifer is inappropriate and that he should consider seeking counseling services for the girls. In addition to speaking with respondent and the girls, Dunn contacted the girls' mother on September 27, 2011. Rachel denied showing Jennifer a pornographic movie while at her home.

- 3 -

She admitted to showering with Emilee and Jennifer, but she was adamant that neither girl had seen or experienced anything inappropriate while staying with her.

The most concerning incident occurred on September 30, 2011, when Jennifer brought a stuffed animal dog to school. Jennifer put the dog on her classmates' faces and pretended to make the dog "pee." Grinnell removed Jennifer from class and asked her why she was making the dog "pee" on her classmates' faces. Jennifer responded, "Well, my Daddy pees on my face." To demonstrate, Jennifer lay down, pulled her underpants aside, and said, "This is what happens to me." She pointed to her vagina and stated, "My Daddy puts his unit right here." She then told Grinnell that her father "takes it out and pees [white] on my face." Immediately after these disclosures, Jennifer curled up into a fetal position and began to cry. Again, respondent was notified and Grinnell contacted DCYF.

Because Dunn was unavailable, a colleague, Robert McMahon (McMahon), assisted in the investigation and responded to the report of abuse on September 30, 2011. He recommended to respondent that Emilee and Jennifer seek medical attention. The children were taken to Newport Hospital for a medical examination; the results of which revealed no injuries or physical signs of sexual abuse. The examination report issued by Newport Hospital authorized detention and removal of the children for seventy-two hours because of Jennifer's disclosure of sexual abuse by respondent. That same evening, the girls were placed in foster care with respondent's cousin, Amy Mullen (Mullen). This placement proved to be problematic; several incidents occurred that warrant our attention. Namely, DCYF informed Mullen that the children could not have any contact with their father. Mullen failed to comply with this directive and gave the girls cards and Christmas presents from respondent. Additionally, Mullen engaged in several inappropriate conversations with Jennifer about the circumstances leading up to the

placement and went so far as to record the child's comments. During these conversations, Mullen attempted to coax Jennifer into identifying the child's stepbrother, Ryan, as the source of the abuse, asking, "[Did] he hit you with his penis[?] * * * In your vagina[?] * * * [I]n your mouth?" Although Mullen testified that she considered the child's statements to be important, she failed to notify DCYF about them.[4] Instead, Mullen gave the tapes to respondent because "he had a right to know." The girls were removed from Mullen's care and placed elsewhere in December of 2011.

In October 2011, Dunn filed petitions in the Family Court alleging abuse and neglect of the children, and DCYF contacted Ann Boutin-Gammon (Boutin-Gammon), an evaluator and counselor at Counseling Services of Rhode Island. Boutin-Gammon was asked to conduct sexual abuse assessments of Jennifer and Emilee. Boutin-Gammon met with Jennifer for the first time on October 14, 2011, and approximately three times thereafter. During these meetings, Jennifer made numerous statements, some of which indicated abuse and others that recanted her statements of abuse. Although at trial Boutin-Gammon testified that her notes from the sessions, memorializing Jennifer's disclosures and recantations, are not specific as to dates and times, Boutin-Gammon recounted specific statements Jennifer made, including: "Daddy peed white on [me]"; "he laid on top of [me]"; and that "his unit was big." Jennifer also disclosed to Boutin-Gammon that Emilee had seen respondent do these things and that Emilee told him to stop because Jennifer was too small and that "it hurt her private area." According to Jennifer, Emilee told respondent to "get off," and he refused, stating, "when [I'm] done [I'll] get off." Additionally, Boutin-Gammon recalled Jennifer stating that respondent would "put his penis up

_____

[4] The respondent also recorded a conversation with Jennifer that was introduced as an exhibit at trial.

- 5 -

and down as well as side to side on her head[.]" Jennifer added that this hurt because he was lying on top of her.

During one session in January 2012, Boutin-Gammon asked Jennifer about the movie that she said she had viewed at her mother's house. Jennifer refused to talk about the movie, instead telling Boutin-Gammon "how Daddy had peed white on [me]" and how "[he] lay[s] on top of [me] and spread[s] [my] legs." In February 2012, Jennifer disclosed that her sister, Emilee, called her a "liar" and said that she made up the stories of abuse. And in March 2012, Jennifer told Boutin-Gammon that she felt "[s]cared, worry, disgust, sorry, sad, confused[,] and guilty." These feelings were related to respondent.

During a session in April 2012, Jennifer initially recanted her statements of abuse and said that she reported the abuse in fear of being made fun of at school. When Boutin-Gammon asked whether Jennifer was referring to any one specific student, Jennifer declared, "Daddy did it." Boutin-Gammon asked Jennifer to draw a picture of what she was referring to, and Jennifer drew a picture of respondent and his "unit" and herself with breasts. Jennifer told Boutin-Gammon: "[respondent] put his unit on [my] breast but he didn't do it," and that, "[I] squeezed his unit." At the next session, Jennifer told Boutin-Gammon: "Daddy will not do it again."

In May 2012, Jennifer disclosed that respondent "put his unit in my throat * * * [i]t hurts so bad [I] can't even breathe when he put his unit in my throat." Boutin-Gammon asked Jennifer what she would say to respondent if she could speak to him. Jennifer said, "Don't do that again" and, "If you trust me, are you going to do it again[,] Dad?"

Despite Jennifer's statements indicating abuse, the child also told Boutin-Gammon that she had lied on occasion. The recantations occurred at Jennifer's first meeting with Boutin-Gammon, on October 14, 2011, when the child spontaneously declared "Daddy didn't do this,"

and again in April 2012, when she first told Boutin-Gammon that she had made up the reports of abuse but then stated that "Daddy did it." Emilee also indicated that Jennifer had not been telling the truth and that their father had not abused either of them. Still, Boutin-Gammon determined that it was "[one-hundred] percent unclear" where Jennifer had learned of such mature behavior and the graphic descriptions of sexual conduct. According to respondent, Jennifer had learned of the adult information from the pornographic movie she watched at Rachel's house. The respondent explained that, at the time, his ex-wife's visitation rights had recently been reinstated, and he insisted that she showed Jennifer the movie in an attempt to gain full custody of the girls. Mullen reported a similar opinion. Mullen informed Dunn that Jennifer reported that the sexual behavior "was just on TV. It was not my Daddy," and that Rachel showed her the video "so she would know what it would look like so she wouldn't have to live with Daddy anymore." Rachel unequivocally denied asking Jennifer to fabricate a story of sexual abuse. She also did not believe that respondent was capable of sexually abusing his daughters.

After a trial that spanned approximately twenty months, the Family Court justice issued a decision on January 24, 2014. The Family Court justice found that, although respondent "attempted to paint a picture that the [m]other, [Rachel], has had a vendetta against him and caused these allegations to be made against him," the record was completely devoid of "any such evidence that [the] mother in any way contrived these allegations to get back at the [r]espondent or attempt to gain custody of these girls." The Family Court justice acknowledged that the testimony and procedures of Boutin-Gammon were flawed, but determined that her evaluation did not negate the clear disclosures that Jennifer made to Grinnell and Dunn—revelations that "were done in such a way, in circumstances that made them reliable and trustworthy." The

Family Court justice found that the material disclosed "was information that no four year old girl would have but for it having been something that she actually experienced."

Furthermore, the Family Court justice rejected respondent's argument that the source of the information was a single pornographic movie that Jennifer allegedly viewed while visiting her mother, declaring: "This court does not think for one moment that the pornographic movie depicting lesbian acts as described by [Jennifer] could be misconstrued when [Jennifer] described her father's unit, holding it, and having him pee white on her. They were two totally different and separate events." In accordance with G.L. 1956 chapter 1 of title 14, the Family Court justice concluded that respondent,

> "did abuse and neglect Jennifer and Emilee * * * in that he has failed to provide said children with a minimum degree of care, supervision or guardianship; that said children are without proper parental care and supervision; and that the father has committed or allowed to be committed against the children, an act of sexual abuse."

Accordingly, on February 4, 2014, the Family Court justice entered a decree committing the children to the care, custody, and control of DCYF; a decree from which respondent has timely appealed to this Court.

### Standard of Review

"When we review an appeal from a decree of the Family Court after a commitment hearing, 'we examine the record to determine whether legally competent evidence exists in it to support findings made by the trial justice.'" In re Adner G., 925 A.2d 951, 957 (R.I. 2007) (quoting In re Mackenzie C., 877 A.2d 674, 685 (R.I. 2005)). "These findings 'are entitled to great weight and will not be reversed on appeal unless the trial justice overlooked or misconceived material evidence, or was otherwise clearly wrong.'" Id. (quoting In re Mackenzie C., 877 A.2d at 685). Under this deferential standard of review, this Court "must search the

record in this case to determine whether legally competent evidence exists to support the trial justice's finding that there was clear and convincing evidence" that respondent abused and neglected Jennifer and Emilee. Id. (citing In re Veronica T., 700 A.2d 1366, 1368 (R.I. 1997)).

## Analysis

Before this Court, respondent assigns numerous errors to the decision of the Family Court justice. Among the enumerated errors are claims that the Family Court justice erred: (1) in allowing Boutin-Gammon, a nonexpert evaluator, to testify in DCYF's case in chief; (2) in construing G.L. 1956 § 14-1-69 as permitting the out-of-court statements of Jennifer to be introduced, but not the out-of-court statements of Emilee; (3) in denying respondent's midtrial motion to undertake a videotaped deposition of an out-of-state expert and then present that in his defense; (4) by overlooking or misconceiving material evidence in making her decision, including Emilee's statements that Jennifer had lied; and (5) in holding that DCYF had proven by clear and convincing evidence that both Jennifer and Emilee had been abused and neglected. After carefully reviewing the extensive record from the Family Court and the arguments of the parties, we conclude that legally competent evidence exists to support the findings of the Family Court justice.

## The Testimony of Boutin-Gammon

We begin by briefly examining respondent's contention that the Family Court justice erred in relying on the testimony of Boutin-Gammon, who was not presented as an expert witness by DCYF. After reviewing the voluminous record in this case, it is apparent that the testimony of Boutin-Gammon was, at times, problematic. However, respondent's suggestion

that her testimony should have been excluded in its entirety pursuant to Rules 701[5] and 803(4)[6] of the Rhode Island Rules of Evidence is not persuasive.

Rule 701 limits opinion testimony by witnesses who are not qualified as experts to "those opinions which are * * * rationally based on the perception of the witness" and are "helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." "This rule is buttressed by this [C]ourt's caveat that the lay witness must have 'had an opportunity to observe the person and to give the concrete details on which the inference or description is founded.'" State v. Gomes, 604 A.2d 1249, 1259 (R.I. 1992) (quoting State v. Fogarty, 433 A.2d 972, 976 (R.I. 1981)). Consistently, this Court has perceived no error when a trial court allows lay-witness opinion testimony that is rationally based on the witness's own perception and is helpful to a determination of a fact in issue. Id.; see also State v. Tep, 56 A.3d 942, 947 (R.I. 2012) ("It is unnecessary to require an expert to testify about what a lay individual could rationally conclude."). "The decision to permit opinion testimony by a lay witness is within the sound discretion of the trial court. Review of the trial court's decision is limited to determining whether the trial court abused its discretion." State v. Mallett, 600 A.2d 273, 276 (R.I. 1991).

---

[5] Rule 701 of the Rhode Island Rules of Evidence provides:
> "If the witness is not testifying as an expert, the witness' testimony in the form of opinions is limited to those opinions which are (A) rationally based on the perception of the witness and (B) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue."

[6] Rule 803(4) of the Rhode Island Rules of Evidence provides:
> "The following are not excluded by the hearsay rule, even though the declarant is available as a witness: * * * [s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment, but not including statements made to a physician consulted solely for the purposes of preparing for litigation or obtaining testimony for trial."

At trial, Boutin-Gammon testified as a nonexpert witness about her opinion and the recommendations that she reached after extensively interviewing Jennifer over the course of several months. Boutin-Gammon's testimony described what she observed during her encounters with the child and her rational opinions drawn from those observations. We cannot conclude that the Family Court justice abused her discretion by admitting Boutin-Gammon's testimony—especially in view of the fact that the Family Court justice accorded little weight to this evidence, opting to place greater weight on the testimony of Grinnell and Dunn. Because this was a nonjury proceeding, there was little risk that Boutin-Gammon's opinion might invade the jury's fact-finding role; accordingly, the Family Court justice did not abuse her discretion in permitting this witness to testify. See In re Corryn B., 914 A.2d 978, 984 (R.I. 2007) (observing that "trial justices presiding over nonjury trials * * * possess the wisdom, training and experience necessary to sort through [evidence] and consider only the aspects that are 'reliable and probative of the issues relating to the [parent's] conduct.'" (quoting In re Stephanie, 660 A.2d 260, 261 (R.I. 1995))).

In regard to respondent's argument that Boutin-Gammon's testimony recounting Jennifer's disclosures should have been excluded as hearsay under Rule 803(4), again we perceive no error. In In re Jessica C., 690 A.2d 1357 (R.I. 1997), we clearly articulated that statements made for the purposes of medical diagnoses or treatment do not have to be made to a physician but may be made "to any person, such as a hospital attendant, ambulance driver, or even a family member, provided they are made for the purpose of diagnosis or treatment." Id. at 1363 (quoting Rule 803 Advisory Committee's note at 1165) (holding that a child's hearsay statements disclosing abuse, made during counseling sessions, were admissible pursuant to Rule 803(4)). In that case, we concluded that a child's statements to her therapist were helpful in

determining whether the child had been sexually abused, and, therefore, the therapist's testimony recounting the child's statements was properly admitted under Rule 803(4). In re Jessica C., 690 A.2d at 1363; see also In re Jean Marie W., 559 A.2d 625, 630 (R.I. 1989) (holding that a child's statements to a social worker detailing alleged incidents of sexual assault are admissible as pertinent to diagnosis and treatment). We have never been hypercritical in our interpretation of Rule 803(4), and we decline respondent's invitation to narrow our prior holdings on this occasion.

**Evidentiary Rulings**

The respondent avers that the Family Court justice abused her discretion in construing § 14-1-69 as precluding the out-of-court statements that Emilee made to her former preschool teacher, Elizabeth O'Loughlin (O'Loughlin).[7] "It is well established that 'the admissibility of evidence is within the sound discretion of the trial justice, and this Court will not interfere with the trial justice[']s decision unless a clear abuse of that discretion is apparent.'" Notarantonio v. Notarantonio, 941 A.2d 138, 149 (R.I. 2008) (quoting DiPetrillo v. Dow Chemical Co., 729 A.2d 677, 690 (R.I. 1999)); see also State v. Ruffner, 911 A.2d 680, 689 (R.I. 2006) ("The admission of a statement under an exception to the hearsay rule is within the sound discretion of the trial

---

[7] General Laws 1956 § 14-1-69, provides as follows:

> "In any custody and/or termination trial and/or a hearing on a motion or probable cause hearing where a petition has been filed by [DCYF] in accordance with §§ 14-1-11, 40-11-7 and/or 15-7-7 in the [F]amily [C]ourt, the court may, in its discretion, permit as evidence any statement by a child under the age of thirteen (13) years old about a prescribed act of abuse, neglect, or misconduct by a parent or guardian, if that statement was made spontaneously within a reasonable time after the act is alleged to have occurred, and if the statement was made to someone the child would normally turn to for sympathy, protection, or advice."

justice and shall not be overturned unless clearly erroneous." (quoting State v. Lynch, 854 A.2d 1022, 1038 (R.I. 2004))).

It appears that, during a chance meeting, Emilee made a spontaneous disclosure to O'Loughlin, indicating that Rachel had coached her daughter into making accusations by showing her a pornographic movie. The Family Court justice refused to admit the testimony, concluding that it constituted hearsay within hearsay.[8] The respondent, however, argues that Jennifer's statements to Emilee and Emilee's statements to O'Loughlin both qualified as exceptions to the hearsay rule permitted under § 14-1-69.

Section 14-1-69 is "a statutory exception to the hearsay rule that applies to disputes involving custody and/or termination of parental rights." In re Deborah M., 544 A.2d 572, 574 (R.I. 1988). Although this Court employs a liberal construction of § 14-1-69, we have delineated three criteria necessary to ensure the reliability of such statements: "that the child communicate the statements concerning physical [and sexual] abuse (1) spontaneously, (2) within a reasonable time after the alleged act(s) of abuse occurred, and (3) to a trusted adult." In re Alexis L., 972 A.2d 159, 166 (R.I. 2009) (citing In re Rocco W., 706 A.2d 1302, 1303 (R.I. 1998); In re Veronica T., 700 A.2d at 1367).

In the event that Emilee's statements to O'Loughlin had been limited to communications concerning physical and sexual abuse, the statements may have fulfilled the reliability prongs of § 14-1-69. However, Emilee's statements related to the alleged motive underlying Jennifer's disclosures and were properly stricken by the Family Court justice as inadmissible hearsay, not conforming with § 14-1-69. See Mallett, 600 A.2d at 278 ("When a hearsay statement includes

---

[8] Rule 805 of the Rhode Island Rules of Evidence provides: "Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules."

within it additional hearsay, each layer of hearsay must conform with an exception-to-the-hearsay rule in order to be admissible at trial.").

Furthermore, Jennifer's alleged statements, as reported by Emilee to O'Loughlin, fail to comply with the third requirement that the disclosures of abuse be made to a trusted adult. See In re Veronica T., 700 A.2d at 1367 (stating that, to be admissible, a child's out-of-court statements concerning physical and sexual abuse "must have been communicated spontaneously to a trusted adult"). Because the statements were not statements of abuse made to a trusted adult, they lack the level of reliability necessary to meet the hearsay exception of § 14-1-69. See In re Veronica T., 700 A.3d at 1367. Accordingly, Emilee's statements to O'Loughlin were properly rejected by the Family Court justice.

Nevertheless, Emilee's statements to O'Loughlin—that Jennifer's accusations were fabricated—were admitted through Dunn's testimony, thus rendering O'Loughlin's testimony "cumulative and of minimal significance." Mallett, 600 A.2d at 277 ("When the evidence admitted is 'cumulative and of minimal significance,' then the error is harmless." (quoting Clarke v. Ellerthorpe, 552 A.2d 1186, 1188 (R.I. 1989))); see also Notarantonio, 941 A.2d at 149 (declining to disturb the trial justice's ruling in excluding testimony where "at best the excluded testimony was cumulative"). Thus, any purported error by the Family Court justice undoubtedly was harmless. See State v. Marr, 731 A.2d 690, 693 (R.I. 1999) (concluding that mother's hearsay testimony about what her son told her about sexual molestation was harmless error when son also testified to those facts).

We briefly pass on a separate evidentiary ruling with which respondent takes issue—that the trial justice abused her discretion by denying respondent's midtrial motion to undertake a videotaped deposition of an out-of-state expert in order to present that testimony at trial. "[A]

trial court has broad discretion in deciding discovery matters, and a decision to allow or deny discovery is reviewable only for abuse of discretion[.]" Cardi v. Medical Homes of Rhode Island, 741 A.2d 278, 278-89 (R.I. 1999) (mem.) (citing Bashforth v. Zampini, 576 A.2d 1197 (R.I. 1990)). Without commenting on the merits of respondent's request to engage in further discovery six months after the commencement of trial and two months after DCYF had rested its case in chief, we simply conclude that the Family Court justice in no way abused her discretion by denying respondent's motion to pause the trial in order for respondent to depose an out-of-state witness who was not disclosed beforehand to opposing counsel. See id.; see also Dawkins v. Siwicki, 22 A.3d 1142, 1154 (R.I. 2011) ("When the trial justice's discretion has been soundly and judicially exercised, in light of the facts and circumstances confronting the court and the parties, the decision will not be disturbed on appeal." (citing Morra v. Harrop, 791 A.2d 472, 476-77 (R.I. 2002))). Moreover, the trial justice did not wholly reject the proffered testimony of respondent's witness; she only denied respondent's request to use a video deposition in lieu of live testimony, citing the benefits of in-court testimony. Accordingly, respondent's suggestion that this Court remand the case for additional testimony is unavailing where respondent's failure to timely depose his intended witness, make an offer of proof of the anticipated testimony, or otherwise have the witness testify in person is of no fault other than his own.

### The Findings of the Family Court

The respondent argues that DCYF failed to meet its burden of proof with respect to establishing that Jennifer and Emilee were abused and neglected. Specifically, respondent avers that there is no evidence to support the finding that Emilee was abused and that the evidence in regard to abuse and neglect of Jennifer was "contradictory, compromised, and anything but clear and convincing." In addition, respondent contends that the Family Court justice overlooked or

misconceived material evidence in making her decision. The respondent's arguments are unavailing.

The burden carried by DCYF in cases involving child abuse is that of clear and convincing evidence. See In re Veronica T., 700 A.2d at 1368 ("A determination that a child has been abused 'shall be made upon clear and convincing evidence.'" (quoting Rule 17(b) of the Family Court Rules of Juvenile Proceedings)). "The clear-and-convincing standard requires that the factfinder form a 'clear conviction without hesitancy of the truth of the precise facts.'" Id. (quoting Parker v. Parker, 103 R.I. 435, 442, 238 A.2d 57, 61 (1968)). Although the clear and convincing standard is significant—requiring the truth of the precise facts to be "highly probable"—it is not a burden of insurmountable proportion. Id. (quoting Parker, 103 R.I. at 442, 238 A.2d at 61). It is, however, a higher standard of proof than that of a fair preponderance of the evidence but less than that required for proof beyond a reasonable doubt. See State v. Fuller-Balletta, 996 A.2d 133, 141-42 (R.I. 2010) ("[C]lear and convincing evidence means more than a mere exercise in semantics. It is a degree of proof different from a satisfaction by a preponderance of the evidence which is the recognized burden in civil actions and from proof beyond a reasonable doubt which is the required burden in criminal suits.'" (quoting Parker, 103 R.I. at 442, 238 A.2d at 60-61)).

The testimony of a single witness, if believed, is sufficient to sustain a jury verdict in a criminal case and, thus, is certainly capable of supporting a finding of fact by clear and convincing evidence. See State v. Rieger, 763 A.2d 997, 1001 (R.I. 2001) ("[A] victim's testimony alone is sufficient to sustain a conviction * * *."). "The factual findings of the trial justice concerning whether this clear and convincing evidence burden has been satisfied are entitled to great weight." In re Veronica T., 700 A.2d at 1368. "[S]uch findings generally will

not be disturbed on appeal unless they are clearly wrong or unless the trial justice misconceived or overlooked material evidence." Id. (citing In re Zachary A., 690 A.2d 853, 854 (R.I. 1997)).

With respect to DCYF's burden of establishing abuse and neglect as to Emilee, this Court has repeatedly held that "evidence of harm to one child of a family is relevant to the issues raised by a dependency-and-neglect petition regarding another child of the family * * *." In re Luz J., 447 A.2d 1148, 1152 (R.I. 1982) (concluding that, although there was no evidence of harm to Luz, DCYF presented evidence of harm to Luz's sister and that evidence was sufficient to establish a likelihood of harm to Luz); see also In re Lester, 417 A.2d 877, 881 (R.I. 1980). We have never recognized a requirement that a court wait until a child is actually harmed before the child is afforded protection. See In re Lester, 417 A.2d at 881. Rather, "[t]he state's role in protecting children may properly be preventive of harm as well as remedial." Id. Certainly, these principles are in accordance with the shared concerns of the court and the state as parens patriae—to prevent "lasting injury, death, or other irreparable harm to the tiny and helpless victims of parental misconduct." Id. ("[A]s we accord due process and all reasonable presumptions in favor of parental authority, we must not erect the barrier so high that it cannot be pierced in order to safeguard these innocent victims.").

Applying the foregoing principles to the decision of the Family Court justice, we are of the opinion that, in finding both Jennifer and Emilee to be abused and neglected, her decision was based on remediation and prevention. See In re Lester, 417 A.2d at 881. The Family Court justice found that there was evidence of abuse to Jennifer and that evidence was sufficient to warrant a finding as to Emilee. In the face of the deeply disturbing testimony with which the Family Court justice was confronted, and which she found to be credible, her finding of abuse as to Emilee was appropriate. See In re Jessica C., 690 A.2d at 1362 (affirming a court's finding of

- 17 -

abuse and neglect where "the totality of the evidence compelled the finding that [the children] were 'at risk of sexual abuse if allowed to be in the presence of and to reside with the parents'").

Finally, with respect to Jennifer, we reject respondent's argument that the Family Court justice overlooked or misconceived material evidence in concluding that the evidence clearly established that Jennifer was abused by respondent. The respondent's contention that the evidence was "contradictory, compromised, and anything but clear and convincing," is without merit.

We are satisfied that each piece of evidence that, according to respondent, was overlooked by the Family Court justice was in fact considered in her decision. The Family Court justice weighed both Jennifer's recantations and Emilee's statements that Jennifer had fabricated the stories of abuse; and concluded that "it is * * * not unusual for a victim to recant." It was within her province to so hold. See In re Veronica T., 700 A.2d at 1368 (affirming a Family Court justice's findings of abuse where the Family Court justice considered the "possible motive for the child to change her story to keep the father with her family," yet still found the child's initial statements of abuse "to be more credible than the child's belated efforts to blame her uncle for the abuse").

The Family Court justice deliberated over Rachel's motive and the possibility that the source of Jennifer's knowledge was a pornographic movie and rejected both prospects, stating "[t]his court does not think for one moment that the pornographic movie depicting lesbian acts as described by [Jennifer] could be misconstrued when [Jennifer] described her father's unit, holding it, and having him pee white on her. They were two totally different and separate events." The Family Court justice accorded scant weight to the testimony of Boutin-Gammon after acknowledging that she "did not always follow proper protocol." She decided, instead to

- 18 -

rely on Grinnell's testimony and the disclosures made to Dunn—that respondent walks around the house naked and sleeps naked while Jennifer is beside him. We are not convinced that the Family Court justice overlooked or misconceived material evidence where the record reflects a thoughtful and carefully deliberated decision, addressing the evidence that respondent declares to be bereft.

It is our opinion that, had the Family Court justice entirely disregarded the disclosures made to Dunn and the testimony of Boutin-Gammon, the testimony of Grinnell, standing alone, was sufficient to sustain the burden of proof in this case. The Family Court justice determined that the child's disclosures to Grinnell, a trusted adult and the first person to whom the child turned, were "done in such a way, in circumstances that made them reliable and trustworthy." Her testimony, recounting the disclosures made to her by four-year-old Jennifer, was "exact as to the crucial elements" and, even unaccompanied by the other corroborative testimony, was sufficient to establish that Jennifer had been sexually abused by respondent. State v. LaPointe, 525 A.2d 913, 914 (R.I. 1987) (sustaining a conviction for first-degree sexual assault even though the evidence of the sole prosecution witness might be characterized as mildly vague and contradictory, where it was "exact as to the crucial elements" and there was nothing in the record indicating that trial justice overlooked or misconceived material evidence); see also State v. Nania, 786 A.2d 1066, 1068 (R.I. 2001) ("[T]he credibility of witnesses and the weight to be accorded their testimony is solely the function of the trial justice." (citing State v. Hull, 754 A.2d 84, 86 (R.I. 2000))).

Jennifer's disclosures to Grinnell were determined by the Family Court justice to be accurate and truthful because "no four year old girl would have [such information] but for it having been something that she actually experienced." It is our opinion that competent

- 19 -

confirmatory evidence exists in the record to support the Family Court justice's findings of abuse and neglect. The voluminous transcripts, exhibits, and memoranda in this case reflect the extensive psychological trauma Jennifer endured while in the care of her father. As the primary caregiver of Jennifer and Emilee, "the law holds [the respondent] to a greater level of substantial responsibility and awareness concerning the well-being of [his] children than it otherwise might in the case of an adult relative or a stranger." In re Chester J., 754 A.2d 772, 778 (R.I. 2000) (quoting In re Nicole B., 703 A.2d 612, 618 (R.I. 1997)). We are satisfied that the respondent failed to live up to this responsibility and that Jennifer suffered abuse "amounting to the most odious form of betrayal." In re Nicole B., 703 A.2d at 618. Her knowledge of such prurient, mature content far exceeds her infantile years in such a way that eliminates any other reasonable explanation.

## Conclusion

For these reasons, the respondent's appeal is denied and dismissed. The decree of the Family Court committing Jennifer and Emilee to the care, custody, and control of DCYF is affirmed. The papers of this case are remanded to the Family Court.

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | In re Emilee K.<br>In re Jennifer K. |
| **Case Number** | No. 2014-139-Appeal.<br>No. 2014-140-Appeal. |
| **Date Opinion Filed** | February 6, 2017 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Associate Justice Maureen McKenna Goldberg |
| **Source of Appeal** | Newport County Family Court |
| **Judicial Officer From Lower Court** | Associate Justice Karen Lynch Bernard |
| **Attorney(s) on Appeal** | For Petitioner:<br><br>Karen A. Clark<br>Department of Children Youth & Families<br><br>Laurel Cynthia Ferrelli<br>Court Appointed Special Advocate<br><br>For Respondent:<br><br>Lauren E. Jones, Esq.<br>Robert S. Thurston, Esq. |